[Civ. No. 28919. Fourth Dist., Div. One. June 29, 1984.]

RICH & WHILLOCK, INC., Plaintiff and Respondent, v.
ASHTON DEVELOPMENT, INC., et al., Defendants and Appellants.

**COUNSEL**

Phillip Stein for Defendants and Appellants.

Thomas E. Wenbourne for Plaintiff and Respondent.

**OPINION**

**WIENER, J.**—Ashton Development, Inc. and Bob Britton, Inc. appeal from the judgment awarding Rich & Whillock, Inc. $22,286.45 for the

balance due under a grading and excavating contract. Following a nonjury trial the court entered judgment after it found a settlement agreement and release signed by Rich & Whillock, Inc., were the products of economic duress and thus provided no defense to its contract claim. We conclude substantial evidence supports the court's finding and affirm the judgment.

*Factual and Procedural Background*

On February 17, 1981, Bob Britton, president of Bob Britton, Inc., signed a contract for grading and excavating services to be provided by Rich & Whillock, Inc. at a price of $112,990. The work was to be done on a project by Ashton Development, Inc., Bob Britton, Inc., was general contractor on the project and the agent for Ashton Development, Inc., in all dealings with Rich & Whillock, Inc. Work began the day the contract was signed.

In late March 1981 Rich & Whillock, Inc., encountered rock on the project site. A meeting was held at the site to discuss the problem. In attendance were Greg Whillock and Jim Rich, president and vice-president of Rich & Whillock, Inc., Bob Britton, Berj Aghadjian, president of Ashton Development, Inc., and a man from a blasting company. Everyone agreed the rock would have to be blasted. The $112,990 contract price expressly excluded blasting. The contract also stated "[a]ny rock encountered will be considered an extra at current rental rates." In response to Britton's inquiry, Whillock and Rich estimated the extra cost to remove the rock would be about $60,000, for a total contract price of approximately $172,000. They also emphasized, however, the estimate was not firm and the actual cost could go much higher due to the unpredictable nature of rock work.

Britton directed Whillock and Rich to go ahead with the rock work and bill him for the extra costs and said they would be paid. Rich & Whillock, Inc., proceeded accordingly, submitting invoices and receiving payments every other week. The invoices separately stated the charges for the regular contract work and the extra rock work and were supported by attached employee time sheets. Toward the end of April Whillock asked Britton if he had any questions about any of the billings. Britton had no questions and told Whillock to continue with the rock work because it had to be done.

By June 17, 1981, after receiving payments totalling $190,363.50, Rich & Whillock, Inc., submitted a final billing for an additional $72,286.45. After consulting with Aghadjian, Britton refused to pay. When Whillock asked why, Britton explained he and Aghadjian were short on funds for the project and had no money left to pay the final billing. Up until he received that billing, Britton had no complaints about the work done or the invoices

submitted by Rich & Whillock, Inc., and had never asked for any accounting of charges in addition to that already provided. Whillock told Britton he and Rich would "go broke" if not paid because they were a new company, the project was a big job for them, they had rented most of their equipment and they had numerous subcontractors waiting to be paid. Britton replied he and Aghadjian would pay them $50,000 or nothing, and they could sue for the full amount if unsatisfied with the compromise.

On July 10, 1981, Britton presented Rich with an agreement for a final compromise payment of $50,000. The agreement provided $25,000 would be paid "upon receipt of this signed agreement," to be followed by a second $25,000 payment on August 10, 1981, "upon receipt of full and unconditional releases for all labor, material, equipment, supplies, etc., purchased, acquired or furnished for this contract up to and including August 10, 1981." Rich repeated Whillock's earlier statements about the probable effects of nonpayment on their business. Britton replied: "I have a check for you, and just take it or leave it, this is all you get. If you don't want this, you have got to sue me." Rich then signed the agreement and received a $25,000 check after telling Britton the agreement was "blackmail" and he was signing it only because he had to in order to survive. Rich & Whillock, Inc., received the second $25,000 payment on August 20, 1981, at which time Whillock signed a standard release form.

In December 1981 Rich & Whillock, Inc., filed this action for damages for breach of contract. The court found Ashton Development, Inc., and Bob Britton, Inc., were liable for the $22,286.45 balance due under the contract, and that the July 10 agreement and August 20 release were unenforceable due to economic duress. On the latter point the court found Britton and Aghadjian "never really disputed the amount of plaintiff's charge in that they never asked for an accounting nor documentation concerning the extra work." The court also stated it disbelieved Britton when he testified Rich & Whillock, Inc., had agreed to do the extra work for a sum not to exceed $90,000. By disbelieving Britton and finding no dispute about the actual amount owed, the court impliedly found Britton and Aghadjian acted in bad faith when they refused to pay Rich & Whillock, Inc.'s final billing and offered instead to pay a compromise amount of $50,000. Based upon its finding of bad faith, the court concluded the July 10 agreement and August 20 release were signed "under duress in that plaintiff felt they would face financial ruin if they did not accept the lesser sum and that defendants, knowing this, threatened no further payment unless plaintiff accepted the lesser sum."

*Discussion*

"At the outset it is helpful to acknowledge the various policy considerations which are involved in cases involving economic duress. Typically, those claiming such coercion are attempting to avoid the consequences of a modification of an original contract or of a settlement and release agreement. On the one hand, courts are reluctant to set aside agreements because of the notion of freedom of contract and because of the desirability of having private dispute resolutions be final. On the other hand, there is an increasing recognition of the law's role in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances." (*Totem Marine T. & B.* v. *Alyeska Pipeline, Etc.* (Alaska 1978) 584 P.2d 15, 21 [9 A.L.R.4th 928], fn. omitted.)

California courts have recognized the economic duress doctrine in private sector cases for at least 50 years. (*Young* v. *Hoagland* (1931) 212 Cal. 426, 430-432 [298 P. 996, 75 A.L.R. 654].)[1] The doctrine is equitably based (*Burke* v. *Gould, supra,* 105 Cal. at p. 281) and represents "but an expansion by courts of equity of the old common-law doctrine of duress." (*Sistrom* v. *Anderson* (1942) 51 Cal.App.2d 213, 220 [124 P.2d 372].) ■ As it has evolved to the present day, the economic duress doctrine is not limited by early statutory and judicial expressions requiring an unlawful act in the nature of a tort or a crime. (Civ. Code, § 1569, subd. 2;[2] *Burke* v. *Gould, supra,* 105 Cal. at p. 282; see generally 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 337-338, pp. 284-286; 13 Williston on Contracts (3d ed. 1970) §§ 1601, pp. 648-649, 1602, pp. 650-651, 656-657.) Instead, the doctrine now may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. (*Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 203-205 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]; *Louisville Title Ins. Co.* v. *Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 799-802 [132 Cal.Rptr. 63];

---

[1]Even earlier applications of the doctrine appear in private sector cases dating back to the turn of the century. (*Burke* v. *Gould* (1894) 105 Cal. 277, 281-283 [38 P. 733]; *Standard Box Co.* v. *Mutual Biscuit Co.* (1909) 10 Cal.App. 746, 758-762 [103 P. 938]; *Rowland* v. *Watson* (1906) 4 Cal.App. 476, 481 [88 P. 495].)

[2]Originally enacted in 1872 and never since amended, Civil Code section 1569 provides: "Duress consists in:

"1. Unlawful confinement of the person of the party, or of the husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband, or wife;

"2. Unlawful detention of the property of any such person; or,

"3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive."

*Thompson Crane & Trucking Co.* v. *Eyman* (1954) 123 Cal.App.2d 904, 908-910 [267 P.2d 1043]; accord, *Totem Marine T. & B.* v. *Alyeska Pipeline, Etc., supra,* 584 P.2d at pp. 22-23; see also 13 Williston on Contracts, *supra,* §§ 1603, pp. 663-665, 1617, pp. 704, 706; Annot., Refusal to Pay Debt as Economic Duress or Business Compulsion Avoiding Compromise or Release (1981) 9 A.L.R.4th 942, 946-947.) ▬ The assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of the economic duress doctrine. (*Leeper* v. *Beltrami, supra,* 53 Cal.2d at pp. 203-204; *Louisville Title Ins. Co.* v. *Surety Title & Guar. Co., supra,* 60 Cal.App.3d at pp. 799-800, fn. 6; accord, *Totem Marine T. & B.* v. *Alyeska Pipeline, Etc., supra,* 584 P.2d at p. 22.) Further, a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin. (*Louisville Title Ins. Co.* v. *Surety Title & Guar. Co., supra,* 60 Cal.App.3d at p. 806; *Thompson Crane & Trucking Co.* v. *Eyman, supra,* 123 Cal.App.2d at pp. 905-907, 909-910; accord, *Totem Marine T. & B.* v. *Alyeska Pipeline, Etc., supra,* 584 P.2d at pp. 22-23.)

The underlying concern of the economic duress doctrine is the enforcement in the marketplace of certain minimal standards of business ethics. Hard bargaining, "efficient" breaches and reasonable settlements of good faith disputes are all acceptable, even desirable, in our economic system. That system can be viewed as a game in which everybody wins, to one degree or another, so long as everyone plays by the common rules. Those rules are not limited to precepts of rationality and self-interest. They include equitable notions of fairness and propriety which preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value. Such exchanges make a mockery of freedom of contract and undermine the proper functioning of our economic system. The economic duress doctrine serves as a last resort to correct these aberrations when conventional alternatives and remedies are unavailing. The necessity for the doctrine in cases such as this has been graphically described: "Nowadays, a wait of even a few weeks in collecting on a contract claim is sometimes serious or fatal for an enterprise at a crisis in its history. The business of a creditor in financial straits is at the mercy of an unscrupulous debtor, who need only suggest that if the creditor does not care to settle on the debtor's own hard terms, he can sue. This situation, in which promptness in payment is vastly more important than even approximate justice in the settlement terms, is too common in modern business relations to be ignored by society and the courts." (Dalzell, *Duress by Economic Pressure II* (1942) 20 N.C.L.Rev. 340, 370.)

*Totem Marine T. & B.* v. *Alyeska Pipeline, Etc., supra,* 584 P.2d 15, presents an example of economic duress remarkably parallel to the circumstances of this case. Totem, a new corporation, contracted with Alyeska to transport pipeline construction materials from Houston, Texas to a port in southern Alaska, with the possibility of one or two cargo stops along the way. Totem chartered the equipment necessary to perform the contract. Unfortunately, numerous unanticipated problems arose from the outset which impeded Totem's performance. When Totem's chartered tugs and barge arrived in the port of Long Beach, California, Alyeska caused the barge to be unloaded and unilaterally terminated the contract. Totem then submitted termination invoices totalling somewhere between $260,000 and $300,000. At the same time, Totem notified Alyeska it was in urgent need of cash to pay creditors and that without immediate payment it would go bankrupt. After some negotiations, Alyeska offered to settle Totem's account for $97,500. In order to avoid bankruptcy, Totem accepted Alyeska's compromise offer and signed an agreement releasing Alyeska from all claims under the contract. (*Id.,* at pp. 17-19.)

About four months after signing the release agreement Totem sued Alyeska for the balance due under the contract. The trial court entered summary judgment for Alyeska based on the release agreement. (*Totem Marine T. & B.* v. *Alyeska Pipeline, Etc., supra,* 584 P.2d at p. 19.) The Supreme Court of Alaska reversed, explaining: "[W]e believe that Totem's allegations, if proved, would support a finding that it executed a release of its contract claims against Alyeska under economic duress. Totem has alleged that Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt; that Totem was faced with impending bankruptcy; that Totem was unable to meet its pressing debts other than by accepting the immediate cash payment offered by Alyeska; and that through necessity, Totem thus involuntarily accepted an inadequate settlement offer from Alyeska and executed a release of all claims under the contract. If the release was in fact executed under these circumstances, we think that under the legal principles discussed above that this would constitute the type of wrongful conduct and lack of alternatives that would render the release voidable by Totem on the ground of economic duress." (*Id.,* at pp. 23-24, fn. omitted.)

Here, Britton and Aghadjian acted in bad faith when they refused to pay Rich & Whillock, Inc.'s final billing and offered instead to pay a compromise amount of $50,000. At the time of their bad faith breach and settlement offer, Britton, and through him, Aghadjian, knew Rich & Whillock, Inc., was a new company overextended to creditors and subcontractors and faced with imminent bankruptcy if not paid its final billing. Whillock and

Rich strenuously protested Britton's and Aghadjian's coercive tactics, and succumbed to them only to avoid economic disaster to themselves and the adverse ripple effects of their bankruptcy on those to whom they were indebted. Under these circumstances, the trial court found the July 10 agreement and August 20 release were the products of economic duress. That finding is consistent with the legal principles discussed above and is supported by substantial evidence. Accordingly, the court correctly concluded Ashton Development, Inc., and Bob Britton, Inc., were liable for the $22,286.45 balance due under the contract.

*Disposition*

Judgment affirmed.

Cologne, Acting P. J., and Staniforth, J., concurred.