In re Thomas A. CARTER and Marilyn J. Carter, Debtors.

RCB BANK, Appellant,

v.

Thomas A. CARTER and Marilyn J. Carter, Appellees.

Bankruptcy No. 91-03018-W.
Adv. No. 91-0323-W..
No. 93-C-212-E.

United States District Court,
N.D. Oklahoma.

Feb. 8, 1994.

Richard D. Mosier, Carle Higgins Mosier & Taylor, Claremore, OK, for appellant.

Bill R. Scarth, Larry E. Rahmeier, Bassman Scarth & Rahmeier, Claremore, OK, for appellees.

### CORRECTED ORDER

ELLISON, District Judge.

This order pertains to the appeal of RCB Bank ("the Bank") from the final judgment of the United States Bankruptcy Court for the Northern District of Oklahoma entered on March 4, 1993. Debtors filed this adversary proceeding seeking relief from a mortgage said to be obtained by duress.

#### Facts

Prior to their bankruptcy, debtors operated pet stores under a franchise with Doktor Pet Center, Inc. Mr. Carter also practiced veterinary medicine in Claremore, Oklahoma. Their first franchise stores were located at Woodland Hills Mall in Tulsa, Oklahoma and in Ft. Smith, Arkansas. In late 1985, they decided to purchase a third franchise to locate a store in Promenade Mall in Tulsa. They claim that in December of 1985 they discussed a loan with Robert McKinney ("McKinney"), executive vice-president of the Bank, who had sought treatment for his pet

at the veterinary clinic. They allege that McKinney took them to lunch in January of 1986 to discuss the deal and that they firmly told him that they would not mortgage their homestead to secure a loan (See Transcript of Trial Proceedings, April 14, 1992 ("Transcript"), at pgs. 29–34 (Marilyn Carter's testimony) and pgs. 68–71 (Thomas Carter's testimony). They claim they were led to believe the Bank would lend them the money with no mortgage on their homestead and proceeded to borrow approximately $600,-000.00 and spent several thousand more during the next four months preparing to open the new store (Transcript at pgs. 31–35).

Debtors contend that McKinney called them in late April of 1986 and took information for a financial statement and in the middle of May, 1986, an appraiser appeared at their home on instructions from McKinney (Transcript at pg. 36). When Mrs. Carter went to make her first draw on the Bank's loan to repay her start-up costs, shortly after that, she was told by McKinney for the first time that the Bank would not lend the money without a mortgage on the homestead (Transcript at pgs. 36 and 49). The Bank advanced her $21,000.00 without the mortgage and she returned home (Transcript at pg. 37).

When Mrs. Carter told her husband what had occurred, he said he would not sign a mortgage and became so angry that he refused to speak to his wife for days (Transcript at pgs. 38 and 73). However, the debtors were unable to secure a loan elsewhere and their creditors needed to be paid, so they felt compelled to sign the loan papers on June 5, 1986, including a mortgage on their homestead (Transcript at pgs. 39–43, 49–50, 53–54).

McKinney denies the lunch meeting in January 1986 ever occurred and claims he never promised the debtors a loan with no mortgage on their homestead (Transcript at pgs. 108 and 162). He claims he first spoke with the Carters about a loan in December 1985, but at that time he merely expressed interest (Transcript at pg. 95). He contends

that he did not meet them or speak with them again until late February or early March of 1986, when they came to his office to discuss the general terms of such a loan (Transcript at pgs. 98, 109–110).

McKinney testified that he took the Carters' request to the Bank's loan committee on March 13, 1986, and the committee told him to get more collateral (Transcript at pgs. 98–104, 112, 152). McKinney claims he told Mrs. Carter of this by telephone on March 17 or 18 and asked for information for a financial statement (Transcript at pgs. 153–154). At the beginning of April he claims he phoned her again and obtained from her the location of the Carters' real estate (Transcript at pg. 154). The real estate was "evaluated" during the first week of April, but McKinney admitted that an appraiser never did appraise the homestead property itself (Transcript at pg. 154).

McKinney then contends he telephoned Mrs. Carter and told her that a mortgage on the homestead would be necessary (Transcript at pg. 155). McKinney contends that early in May Mrs. Carter made a definite loan request and promised to mortgage her homestead (Transcript at page 156). He contends that the documents were drawn up and signed without further difficulty, and he discussed an early release of the mortgage with Mr. Carter (Transcript at pgs. 114–115, 131–135, 157).

The Bank's documentation of the transaction is very limited. The Carters never submitted a formal written loan application. Minutes of a loan committee meeting, dated "3–13–86" report a loan to "M.J. Carterm [sic] Inc. . . . To pay off BOK & money for new store," secured by "Leasehold imrpove. [sic], equip, fix, inv. and Accts Rec" with "pers. sign by Marilyn & Thomas Carter." The minutes also report: "Committee would prefer real estate as additional collateral. [McKinney] will check with the Carters and bring back[.]" A "loan worksheet" exists, bearing no date, but referring to a note dated "6/5/86." This document consists of a preprinted form with blanks filled in by hand-

writing reporting collateral consisting of "leasehold improvements/Real Estate/equipment/inventory/fixtures: Woodland Hills Mall/Promenade Mall/45 acres R/E." After the words "Real Estate" is added the note "(2nd)" in different handwriting.

The closing documents included one unusual item designated as a "Loan Agreement" and dated "June 5, 1986." It provides as follows:

> This agreement is between Rogers County Bank of Claremore, Oklahoma, the lender, and M.J. Carter, Inc., the borrower, and covers the note dated June 5, 1986 in the amount of $125,000.00.
>
> The lender agrees to release the second mortgage real estate collateral on the above mentioned note in June, 1989, if approximately one-half of the note is paid, and if the payments and loan have been handled in a satisfactorily [sic] manner.

This document is signed by McKinney and by Mr. and Mrs. Carter.

### Standard of Review

■ This court has jurisdiction to hear appeals from final decisions of the bankruptcy court under 28 U.S.C. § 158(a). Bankruptcy Rule 8013 sets forth a "clearly erroneous" standard for appellate review of bankruptcy rulings with respect to findings of fact. *In re Morrissey,* 717 F.2d 100, 104 (3rd Cir.1983). However, this "clearly erroneous" standard does not apply to review of findings of law or mixed questions of law and fact, which are subject to the *de novo* standard of review. *In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir.1988).

### Factual Determinations Not Clearly Erroneous

■ Having reviewed the applicable transcript and exhibits, the court finds that the Bankruptcy Court's factual conclusion that the debtors' version of the story was more reliable than McKinney's is not clearly erroneous. The debtors began obligating them-

selves on the new pet store at a time when McKinney claimed they had not even discussed with him the general terms of a possible loan. They had fully committed themselves to the new venture and were beginning construction of the store at a time when McKinney claimed they had not made a loan request or settled the requirements of collateral. The bankruptcy court had sufficient basis to conclude that such conduct, especially by those who had previously shown themselves careful and capable business people, without a loan commitment, was unlikely.

McKinney's testimony that .negotiations were conducted in his office in an ordinary manner is suspect because there is no ordinary loan application. His statement that the Bank "evaluated" the Carters' real estate is inconsistent with his admission that no appraisal of the homestead was accomplished. His statement that the closing was routine and that he did not suspect any difficulty about the homestead mortgage is refuted by the unusual "loan agreement" of June 5, 1986, which indicates that on that date McKinney himself had reservations about the homestead mortgage.

The Bankruptcy Court concluded that the Bank's documentation of the transaction was also more consistent with the debtors' version of the story than with McKinney's. The minutes of the loan committee meeting on March 13, 1986 indicate that the deal which was brought before the committee was for a loan secured only by "Leasehold improve., equip, fix., inv. and Accts Rec." It was noted that the committee was uncomfortable with this arrangement and stated it would "prefer real estate." As the Bankruptcy Court surmised, the real estate which the loan committee had in mind may have been the Carters' half-interest in land just outside Claremore, which was already subject to a mortgage which the new loan was expected to pay off, and which the Carters admitted discussing with McKinney as possible collateral.

At some point McKinney focused instead on the debtors' homestead. The loan worksheet dates the Carters' note as "6/5/86." Since, even according to McKinney, the Carters did not make a formal "loan request" until May, the closing date could not have been known until shortly before the closing occurred on June 5, 1986. Therefore the loan worksheet must have been prepared not long before June 5, 1986. The notation "(2nd)" was inserted sometime after the first version of the worksheet had been prepared. This evidence supports the bankruptcy court's conclusion that the Bank must have finally determined to take a second mortgage on the Carters' homestead not long before June 5, 1986, and that the loan was originally contemplated without a mortgage on the debtors' homestead.

### *Procedural History*

Subsequently, the pet stores began to fail and the debtors ceased making mortgage payments to the Bank in November, 1990. In 1991, their company filed Chapter 7 bankruptcy. No assets were available for distribution to unsecured creditors, and the case was closed at the beginning of September, 1991. No discharge was entered because, as guarantors, the debtors were individually liable for unsatisfied and undischarged debts of the company. On August 23, 1991, they personally filed Chapter 7 bankruptcy, reporting debts totalling $636,178.68 and assets totalling $163,967.06. All assets were secured or exempt.

On October 22, 1991, the Bank filed its "Motion to Modify Automatic Stay [and] for Abandonment ...," announcing an intent to foreclose its mortgage on the Carters' homestead. The Carters objected pursuant to 11 U.S.C. § 502(b)(1) [1] and commenced this adversary proceeding.

The debtors' complaint sought to determine the validity and extent of the Bank's

---

1. Title 11 of the United States Code, § 502(b), provides that a claim may be disallowed "to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any ... applicable law for a reason other than because such claim is contingent or unmatured."

lien under § 506(d) of the Bankruptcy Code, and asserted that it was not an allowed secured claim and therefore void. Under 11 U.S.C. § 506(d), when a claim against a bankruptcy estate is disallowed under § 502(b), any lien securing the claim fails together with the underlying claim and is void. *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Debtors asserted that the Bank's mortgage on their homestead was unenforceable under Oklahoma law, because said mortgage was "obtained ... contrary to prior agreements and loan commitments ... through ... over reaching and fraud ... [and] wholly without consideration." (Complaint ¶¶ 5, 6, 7).

The debtors admit that they owe the Bank an enforceable debt properly secured by collateral other than their homestead. The Bankruptcy Court was not asked to invalidate the Bank's claim, but only to determine that the claim was not secured by the homestead. The debtors asked the Bankruptcy Court to declare the Bank's mortgage on their homestead unenforceable as a matter of Oklahoma law.

The Bankruptcy Court properly concluded that the action, though grounded in state law, was within bankruptcy subject-matter jurisdiction under 28 U.S.C. § 1334(b) and was a core proceeding under 28 U.S.C. § 157(b)(2). The Bank admitted that the action constituted a core proceeding in its amended answer.

### *Bankruptcy Court's Legal Conclusions*

The debtors asserted that the Bank's mortgage on their homestead was unenforceable and should be rescinded because of lack of genuine consent, or presence of "duress," and lack of consideration. The Bankruptcy Court examined the definitions of duress, menace, actual and constructive fraud, undue influence, and mistake of fact and law in the Oklahoma Statutes and concluded as follows:

> [T]he evidence herein is clear and convincing that the Carters' consent to mortgage their homestead to secure Mrs. Carter's business loan was obtained by constructive fraud under 15 O.S. § 53(3), § 59(1), and

by undue influence under 15 O.S. § 53(4), § 61(3)—but not by "duress" as narrowly defined by 15 O.S. § 53(1), § 55, or by menace under 15 O.S. § 53(2), § 56, or by actual fraud under 15 O.S. § 53(3), § 58, or by that type of constructive fraud specified in 15 O.S. § 59(2), or by those types of undue influence specified in 15 O.S. § 61(1), (2), or by mistake of fact or law under 15 O.S. § 53(5), §§ 63–65.

The Bankruptcy Court based these conclusions on the following facts revealed through the parties' testimony: (1) McKinney did not kidnap anyone or steal or impound any of the debtors' property, so there was no "duress" within the meaning of Okla.Stat. tit. 15, § 53(1) or § 55; (2) McKinney did not threaten to kidnap anyone, to smash up any property, or to ruin anyone's reputation, so there was no "menace" within the meaning of Okla.Stat. tit. 15, § 53(2) or § 56; (3) there was no clear and convincing evidence that McKinney knew that his promise to lend money without a mortgage on the homestead was false when he made it or not warranted by his information at the time or that it was made without any intention of performing or was in any manner intended to deceive, so the debtors failed to show actual fraud within the meaning of Okla.Stat. tit. 15, § 53(3) and § 58; (4) McKinney had a duty to perform his original agreement and breached that duty by refusing to lend money under the terms he had agreed to, gaining an advantage, indirectly for himself and directly for the Bank, by misleading the debtors and causing them to mortgage their homestead to their prejudice, so there was constructive fraud within the meaning of Okla.Stat. tit. 15, § 53(3) and § 59(1), but no constructive fraud under Okla.Stat. tit. 15, § 59(2); (5) while McKinney did not abuse a position of confidence or authority under Okla.Stat. tit. 15, § 61(1) and neither of the debtors suffered from "weakness of mind" which might be taken advantage of under Okla.Stat. tit. 15, § 61(2), McKinney helped create and then took oppressive and unfair advantage of their financial needs and distress in a grossly oppressive and unfair way and obtained their

consent through undue influence within the meaning of Okla.Stat. tit. 15, §§ 53(4) and 61(3); (6) there was no factual mistake by the parties, but merely a decision by McKinney to change the original terms agreed upon and a belief by debtors that McKinney would keep his word, so there was no showing of a mistake of fact under Okla.Stat. tit. 15, §§ 53(5), § 63, or § 65; and (7) there was no showing of a misapprehension of the law by any of the parties, so there was no mistake of law under Okla.Stat. tit. 15, §§ 53(5) and § 64.

The Bankruptcy Court found that the Bank's mortgage on the debtors' homestead was obtained by economic duress, more properly designated as a type of constructive fraud or undue influence, since their consent to the contract was only given because of a misuse of economic pressure.

### The Doctrine of Economic Duress

■ In its brief, the Bank focuses on the Bankruptcy Court's discussion of the doctrine of economic duress and argues that the elements of economic duress laid out in *Centric Corp. v. Morrison–Knudsen Co.*, 731 P.2d 411 (Okla.1986), are not present in this case.

In *Centric*, the court held that the theory of economic duress could be a basis for avoiding a mutual release and settlement agreement, recognizing that equity precludes wrongful exploitation to obtain "disproportionate exchanges of value" and courts may correct inequitable exchanges between those with unequal bargaining power. *Id.* at 414. The court set out the elements of economic duress: (1) the contract was the result of a wrongful or unlawful act, initiated and committed with knowledge of its impact and for the purpose of coercion, (2) the coerced party had no reasonable alternative to the contract, and (3) the coercion caused detriment to the coerced party. *Id.* at 417.

The Bankruptcy Court found that *Centric* and much earlier Oklahoma court decisions "purport to rewrite state statutes to fit the judges' notions of 'the evolving common law,'" resulting in an "arrogation of judicial power ... not justified even by necessity" which expanded the concept of "duress" far beyond statutory limits. (Memorandum Opinion and Order, pgs. 26–27) (citing *Centric*, 731 P.2d at 415). The Bankruptcy Court noted that these courts could have reached the same result on other grounds provided by statute, such as "menace," "constructive fraud," or "undue influence." (Memorandum Opinion, pg. 27). It concluded that these decisions could be legitimized by treating their doctrine of "economic duress" as an ill-chosen name for "constructive fraud" under Okla.Stat. tit. 15, § 59 or "undue influence" under Okla.Stat. tit. 15, § 61(3). Pointing out that Okla.Stat. tit. 15, § 55 restricts the meaning of "duress," it found that the wrongful obtaining of a show of consent by unconscionable misuse of economic pressure is actionable as "constructive fraud" or "undue influence."

Legal conclusions are reviewed *de novo*. The bankruptcy court erred in rejecting the doctrine of "economic duress" recognized by the Oklahoma Supreme Court.

### Constructive Fraud

■ "Constructive fraud" is defined in § 59 as consisting of *"any breach of duty* which, without an actually fraudulent intent, gains an advantage to the person in fault...." A bank has no duty to make a loan on the precise terms requested by its customer; here the bankruptcy court found that there was an oral offer to make a loan and an acceptance, resulting in a contract which was later modified through the use of economic pressure to include additional, oppressive terms. However, the loan agreement was finalized on terms that the Carters were fully aware of. The Bank made the loan, and fulfilled the contractual obligations it undertook in connection with the loan as finalized. It did not breach the loan contract, or any legal or equitable duty which would give rise to a separate cause of action.

To obtain relief, the Carters must rely on the equitable doctrine of economic duress to

assert a defense to the Bank's foreclosure action.

The Oklahoma Supreme Court made this clear in *Cimarron Pipeline Constr. Inc. v. United States Fidelity & Guar. Ins. Co.*, 848 P.2d 1161 (Okla.1993), where it recognized that economic duress was an equitable doctrine in contract law, but refused to find that it gave rise to an independent tort under Oklahoma law. *Id.* at 1162. See also, *Roberts v. Wells Fargo AG Credit Corp.*, 990 F.2d 1169 (10th Cir.1993), where the Tenth Circuit recognized Oklahoma's acceptance of economic duress as a defensive doctrine, but refused to apply it where the bank simply exercised its contractural right not to renew a line of credit.

### Undue Influence

■ "Undue influence" is defined in § 61 as follows:

Undue influence consists:

1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him.

2. In taking an unfair advantage of another's weakness of mind; or,

3. In taking a grossly offensive and unfair advantage of another's necessities or distress.

While the text of § 61(3) seems, at first glance, to apply to the facts of this case, the context in which it appears belies this.[2] The court has been unable to find any case that applies this language to an arm's length business transaction where economic coercion has been used to gain unfair advantage. Instead, the statute has been consistently invoked in personal situations where the prospect of undue influence has arisen out of

confidential interaction. See, for example *In re Estate of Webb v. Okla. Nat. Bank and Trust of Chickasha*, 863 P.2d 1116 (Okla. 1993). The type of personal relationship needed to give foundation to a charge of "undue influence" did not exist between the Carters and the Bank. There was no confidential or fiduciary relationship between the parties here—they dealt with each other only at arm's length in a business setting.

### Analysis of Centric

■ This court agrees with the result reached by the Bankruptcy Court, and quarrels only with its method of reaching that result. Rather than jettison the doctrine of economic duress established by the Oklahoma Supreme Court in *Centric*, the court concludes that it should be applied to this case.

The *Centric* decision involved the repudiation of a settlement agreement and release, not a homestead mortgage. This factual distinction is notable, because different equitable considerations attach depending upon the type of contract involved. In discussing the equitable basis for setting aside settlement agreements, the *Centric* court emphasized that it is not enough for an alleged victim of economic duress to merely show its reluctance to settle, financial embarrassment, or business necessities.

■ The bank seizes upon the "business necessity" dictum in *Centric*, and argues that the Carters' consent was motivated by "business necessity", and is therefore specifically placed outside the remedial reach of the doctrine of economic duress. "Business necessity" is not specifically defined in the *Centric* opinion. However, for this exclusion to make sense in the overall context of the opinion, it must be construed to apply to independent or undisclosed business necessity, as opposed to

---

2. The reference to "necessities" in this statutory context more likely pertains to "necessaries" such as food, drink, clothing, shelter, and medi-

cal care (and the term "distress" to the lack thereof), than to any economic or business urgency.

disclosed business necessity that arises as a direct result of the offending coercive acts, such as we have here.[3]

When the cost of ongoing litigation poses a threat to the continuing economic viability of a litigant, settlement makes sense and should be encouraged. Usually, settling parties go to great lengths to conceal or minimize any economic difficulties during the course of settlement negotiations, in order to avoid any appearance of weakness, present a stronger posture, and gain an advantageous deal. To allow a settlement negotiated at arm's length to be later set aside ·on the grounds of economic duress due to some previously undisclosed or latent "business necessity" would be unfair to the party who compromised in good faith. Put in proper context, the *Centric* dictum regarding "business necessity" makes sense.

However, it makes no sense to extend the "business necessities" exclusion recognized in *Centric* to the facts of the present case, where the bank had exquisite knowledge of the Carter's financial circumstances and the disastrous impact its action could have. To do so would cut against the essence of the economic duress doctrine articulated in the opinion.

*Centric* requires a court to look at the circumstances of each case. The circumstances here involve the coerced compromise of a homestead by means of the bank's willful creation of pressing business necessity which did not exist prior to its wrongful conduct. This court believes that the Oklahoma Supreme Court, when confronted with facts such as these, would apply the doctrine of economic duress, grant relief from the oppressive mortgage, and limit the doctrine's "business necessity"· exception to situations where equity would not be served. The *Centric* court said "[t]he doctrine of economic duress comes into play *only* when conventional alternatives and remedies are unavailable to correct aberrational abuse.... It is available solely to prevent injustice, not to create injustice." 731 P.2d at 414 (emphasis in original).

### *Conclusion*

■ In this case the theory of economic duress must be applied to prevent injustice and do equity. While a bank may request additional collateral to secure a loan, it is not fair to wait until the borrowers are hopelessly committed to the loan transaction to inform them of the new requirement. Given the timing of the homestead mortgage, the Carters had no reasonable alternative but to sign the loan and mortgage agreements. The *Centric* court made clear that an equitable remedy is available when the acts of the coercing party "have deprived the coerced party of its free will, leaving no adequate legal remedy nor reasonable alternative available." 731 P.2d at 416. The court said that "each case must rise and fall on its own merits" and that "the issue is one of fact to be determined after consideration of all the circumstances surrounding the transaction." *Id.* at 417.

The court concludes that rescission was proper under Okla.Stat. tit. 15, § 233, because the debtors' consent to mortgage their homestead was obtained by economic duress. The debtors rescinded promptly enough, as

---

**3.** The facts giving rise to the *Centric* opinion bear this out. Centric was a subcontractor which alleged that Morrison–Knudsen, a construction company that acted as the construction manager for the General Motor assembly plant in Oklahoma City, "was fully aware of its precarious financial position", when it presented Centric with a "take it or leave it" low-ball offer. Centric claimed it accepted that offer only to avoid bankruptcy, and later attempted to repudiate the offer on the basis of economic duress.

The court also discussed other cases in its opinion that followed a similar fact pattern. *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.*, 584 P.2d 15 (Alaska 1978) ("Alyeska deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt" or face bankruptcy); *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal.App.3d 1154, ·204 Cal.Rptr. 86 (4th Dist.1984) (at the time of the settlement offer, "the contractor knew that the subcontractor was overextended, and that it faced imminent bankruptcy if the final bills were not paid.")

required by Okla.Stat. tit. 15, § 235[4], because they were not free from economic duress until their complete financial collapse and bankruptcy rendered them immune to further economic pressure by the Bank. They brought their adversary proceeding as soon as they were aware of their right to rescind. The bankruptcy court's factual finding that the Bank had first agreed to lend them funds on the strength of a mortgage on other items was not clearly erroneous. Because they received no additional value from the Bank in return for the mortgage on their homestead, they need return nothing to the Bank.

The Bankruptcy Court's decision in this matter is affirmed.

---

4. Okla.Stat. tit. 15, § 235, regarding the duty of a party attempting rescission, states as follows:

Rescission, when not effected by consent, can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to comply with the following rules:

1. He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind; and,

2. He must restore to the other party everything of value which he has received from him under the contract; or must offer to restore the same upon condition that such party shall do likewise, unless the latter is unable, or positively refuses to do so.