**Ronald D. JOHNSON, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. C 94–20453 EAI.**

United States District Court, N.D. California.

June 16, 1995.

Lee Burdick, William Sanders, Prima Legal Services, Redwood City, CA, for plaintiffs.

Steven Brick, Thomas Klein, Orrick, Herrington & Sutcliffe, San Francisco, CA, for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE SIXTH AND SEVENTH CLAIMS OF SECOND AMENDED COMPLAINT (PHASE I OF TRIAL)

INFANTE, United States Magistrate Judge.[*]

### I. Introduction and Background

Plaintiff Ronald D. Johnson is a former employee of defendant International Business Machines Corporation ("IBM") who was laid-off from his position at one of IBM's San Jose divisions in late 1993 and early 1994. He asserts federal race and age discrimination claims, as well as several supplemental

---

[*] The parties consented pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73 to trial before a magistrate judge.

state law claims, in connection with his discharge.

Johnson also purports to represent an uncertified class of similarly-situated former IBM employees, all of whom signed a written release of legal claims against and covenant-not-to-sue IBM in consideration for enhanced severance benefits. The sixth and seventh claims of the Second Amended Complaint, filed February 3, 1995, assert that the uncertified class was subjected to, respectively, economic duress and undue influence at the time each signed the release and covenant-not-to-sue because of their distress at losing their jobs and the uncertain Silicon Valley job market. Both claims seek rescission of the release and covenant-not-to-sue and contain offers to remit the severance benefits in the event the release and covenant-not-to-sue is ordered rescinded.

The parties agreed to bifurcate discovery and trial of the claims of economic duress and undue influence from the remainder of the litigation.[1] Phase I of the lawsuit, limited to Johnson's sixth and seventh claims, was tried to the Court without a jury over several days, on May 9–11 and 16–18, 1995. As noted, on this initial phase of the action, Johnson seeks rescission of the release and covenant-not-to-sue. IBM seeks an order of dismissal of the action with an award of costs. The Court's findings of fact and conclusions of law regarding Phase I of the trial are set forth below.

## II. *Findings of Fact*

1. IBM is a New York corporation with its principal place of business in that State.

2. Plaintiff Johnson, an African–American San Jose resident, was employed by IBM as a mainframe computer programmer for a period of approximately twenty years.

3. Johnson was hired by IBM in 1973 upon graduation from California State University at Los Angeles.

4. Johnson started working at IBM's San Jose facility, the Storage Systems Division ("SSD"), in 1974 and remained continuously employed by IBM until he was laid off effective January 27, 1994.

5. Johnson's performance evaluations were consistently good during his first five years of employ, but declined thereafter, and in later years were barely satisfactory.

6. On October 28, 1993, IBM announced a Storage Systems Division Resource Reduction Program ("SSRP"). Johnson was notified by his manager, Paul Pederson, that he had been designated a "surplus employee" and would be involuntarily laid-off effective December 31, 1993. Johnson was given a packet of materials describing the SSRP and escorted by Pederson from the SSD facility.

7. The SSRP "surplus employee" designations were based on employee performance ratings. The three lowest-rated of the thirty-two SSD computer programmers were designated surplus, and Johnson had the lowest performance rating among them.

8. The SSRP was the first *involuntary* reduction-in-force program ever instituted by IBM at its SSD facility in San Jose, and among the first lay-offs by IBM at any of its facilities. IBM had an historical tradition, trumpeted in its employee handbook, of providing workers with job security. IBM variously told employees that it engaged in "great", "all-out" and "extraordinary" efforts—including retraining, reassigning and relocating employees—to ensure "full employment" of its workforce.

9. IBM's employee handbook, *About Your Company*, as periodically revised, states: "IBM has not established any specific term of employment; therefore termination may be initiated at any time by either an employee or by management." Further, the handbook provides that "IBM retains complete and full discretion to modify, amend or cancel any of [its] separation allowance plans". A 1992 revision to the handbook elaborates:

> "In the past IBM has provided separation allowances from time to time to employees upon termination where the employee faces a period of expected unemployment, in connection with a mutual resignation or as an exit incentive to resolve overstaffing or workload imbalances.... The contents of these programs have varied widely ac-

1. Case Management Scheduling Order, filed December 5, 1994, at pp. 1–2.

cording to business needs at the time of their announcement.

"It is not possible to predict how or when circumstances might arise to require changes in the current separation allowance plans or the addition of new separation allowance plans to respond to new business needs. Each separation allowance plan is designed to respond to the particular business needs at the time of announcement. Only top management makes these decisions. Managers outside of top management are not intended to know about the consideration of such changes, and no manager is authorized to discuss, give opinions, predict or otherwise comment on possible future changes in separation allowance plans or termination incentive programs. Employees are cautioned that they may not rely on such discussion, opinion, prediction or other managerial comment. You should understand that IBM may adopt new or modified separation allowance plans or exit incentive plans that, depending on your individual circumstances, may be more or less advantageous to you than those currently offered, or that IBM may withdraw such plans."

Finally, the handbook states: "Nothing contained in any section of this book shall be construed as creating an express or implied obligation on the part of IBM."

10. The SSRP provided that employees who were designated as surplus personnel were eligible to receive certain benefits, including outplacement assistance, career counseling, job retraining, and an enhanced "separation allowance".

11. Under the terms of the SSRP, all employees who were designated as surplus were eligible to receive, at IBM's discretion, a separation allowance of two week's pay. The SSRP also provided that, in consideration of the execution of a General Release and Covenant Not to Sue (the "Release"), surplus employees could receive an enhanced separation allowance of one week's pay for each six months of accumulated service, up to a maximum of twenty-six weeks pay. The enhanced separation allowance was the only

of several separation benefits conditioned on signing the Release.

12. The SSRP also provided that by November 5, 1993, surplus employees could apply for alternate, generally lower-paying, positions in the SSD manufacturing area. Some of the manufacturing positions were sedentary, and it was not a condition of obtaining a manufacturing position that an employee release IBM from liability in connection with his discharge from his previous position. Eighty-nine designated surplus employees applied for manufacturing positions, and each was offered a position by the end of November 1993. Fifty-nine of these accepted the position, while the remaining thirty opted to instead sign the Release and receive enhanced severance benefits. Johnson, however, never applied for a manufacturing position at SSD.

13. During the period October 28 through December 31, 1993, Johnson continued to be employed by IBM and received his regular salary and benefits but was not expected, or permitted, to perform his previous duties. Johnson's receipt of regular paychecks during this period was not conditioned on his ultimately signing the Release.

14. From October 28, 1993 through at least the end of January 1994, Johnson was emotionally upset about being laid-off, was concerned about his financial situation and believed that he had been designated a surplus employee because of his race. He did not seek professional counseling during this period and was not mentally-incapacitated by a depressive disorder.

15. Johnson suffers from a rare skin condition, known as pachyonychia congenita, which becomes exacerbated when he is under stress. The dermatological affliction, during pronounced periods, causes soreness and callousing of Johnson's hands and feet, and he encounters discomfort in walking. From October 28, 1993 through at least the end of January 1994, Johnson's skin condition was exacerbated and flared-up due to stress related to his being laid-off. However, Johnson has never at any time been immobilized or incapacitated by his skin condition.

16. On or about December 14, 1993, Johnson sent a letter to Mike Shum, IBM's SSD Resources Program Manager and administrator of the SSRP, alleging that he had been designated as a surplus employee for racially discriminatory reasons and requesting that his termination be postponed beyond December 31, 1993 pending IBM's investigation of Johnson's charges.

17. On December 20, 1993, Shum informed Johnson that he had received Johnson's December 14, 1993 letter and that IBM would investigate Johnson's charges. Shum also told Johnson that IBM would place Johnson on an unpaid leave of absence for the period from December 31, 1993 until the investigation was completed.

18. IBM's internal investigation of Johnson's discrimination charges resulted in a determination that the charges were unfounded. The determination was communicated to Johnson on or about January 24, 1994.

19. In the meantime, on January 4, 1994, Johnson consulted with Robert Baker, an attorney whom he had located in the "yellow pages" of the local telephone directory. The purpose of the consultation regarded Johnson's potential claims against IBM. The attorney reviewed Johnson's letter to Shum and told Johnson that if he signed the Release, he would have difficulty pursuing his discrimination charges.

20. On January 24, 1994, Johnson was examined by Denise Clement, M.D., an IBM physician. Dr. Clement observed callousing of Johnson's hands and feet, tenderness in his heels, and purplish discoloration of his toes. She noticed, nonetheless, that Johnson was able to walk "normally". Dr. Clement observed that Johnson was coherent, articulate and cooperative. He understood the questions posed to him and was able to make judgments. Dr. Clement concluded that Johnson was capable of searching for and performing sedentary work which did not require extensive walking or standing.

21. On January 27, 1994, at IBM's personnel office in San Jose, Johnson signed the Release, which he had read and understood. He received a check dated December 28, 1993 representing 26 weeks of separation pay, the maximum permitted under SSRP. The gross amount of the check was $19,-852.64; with deductions, the net amount was $13,700.86.

22. The Release pertinently provides:

*"IBM ADVISES YOU TO CONSULT AN ATTORNEY BEFORE YOU SIGN THIS RELEASE.*

"If you feel that you are being coerced to sign this General Release and Covenant Not to Sue (hereinafter 'Release'), that your signing would for any reason not be voluntary, or you believe the process by which you have been offered this Release or the payment in exchange for this Release is discriminatory, you are encouraged to discuss this with your manager, the SSRP Project Office or Human Resources before signing this Release. After reviewing the Release with your personal attorney, you may discuss concerns you have with your manager, or your personal attorney can contact IBM legal counsel at your location. You should thoroughly review and understand the effects of the Release before signing it.

"In exchange for the sums and benefits which you will receive pursuant to the terms of the San Jose Storage Systems Division Resource Reduction Program (SSRP), (Ronald Johnson) (hereinafter 'you') agrees to release International Business Machines Corporation (hereinafter 'IBM') and its benefits plans from all claims, demands, actions or liabilities you may have against IBM of whatever kind, including but not limited to those that are related to your employment with IBM, the termination of that employment, or other severance payments …

\*     \*     \*     \*     \*     \*

"You agree that you will never institute a claim of any kind against IBM, or those associated with IBM, including but not limited to, claims related to your employment with IBM or the termination of that employment or other severance payments … If you violate this Release by suing IBM …, you agree that you will pay all costs and expenses of defending against the suit

incurred by IBM ..., including reasonable attorneys' fees."

(Emphasis in original).

23. At no time between October 28, 1993 and January 27, 1994 did Johnson discuss the terms of the Release with IBM personnel. Nor did anyone from IBM ever urge, instruct, or apply any pressure whatsoever upon, him to sign the Release.

24. Had Johnson not signed the Release, at IBM's discretion, he would have received a separation allowance representing only two weeks pay, in a gross amount of $1,527.20, less deductions. Whether or not he signed the Release, Johnson would have been involuntarily terminated by IBM.

25. Johnson's job with IBM paid him roughly $40,000 annually at the time he was laid off and was his only source of income. Johnson had credit cards and other credit lines of roughly $18,000 available to him.

26. Johnson jointly owns a home in San Jose with his retired and disabled father. The household expenses are roughly $2000 per month. Johnson has a live-in girlfriend, Maxine Stokely, who, except for sporadic grocery purchases, does not contribute toward these expenses.

27. In November 1993, Johnson purchased a computer and printer for $2000. He used these items to prepare his resume.

28. Between October 31, 1993 and March 1, 1994, the labor market for computer programmers in Silicon Valley was favorable. There were numerous opportunities for experienced computer programmers, including mainframe programmers. Even the most discriminating applicant was likely to find employment in the $40,000 to $45,000 range within a period of two months.

29. Johnson did not begin a job search in earnest until after he signed the Release on January 27, 1994.

30. On April 4, 1994, Johnson obtained full-time employment as a computer programmer with Software Research and Development in Phoenix. He was compensated at

a rate of $25 per hour, or $50,000 per year (based on a forty-hour workweek times 50 weeks), which was a higher rate of remuneration than Johnson had been paid in his final position with IBM (disregarding the value of fringe benefits).

31. In May 1994, desiring to relocate back to California, Johnson accepted full-time employment with Household Credit in Salinas, California as a computer programmer. Johnson's initial salary was $45,000 per year, again a higher rate of remuneration than Johnson had been paid in his final position with IBM (disregarding the value of fringe benefits).

### III. *Conclusions of Law* [2]

1. The Court has subject matter jurisdiction on the basis of the diversity of citizenship between the adverse parties. 28 U.S.C. § 1332.

2. Parties to a contract must freely and mutually consent to its terms. Cal.Civ.Code § 1565. If consent to a contract is not freely given, the contract may be rescinded by the parties. *Id.,* § 1566. "An apparent consent is not real or free when obtained through duress ... [or] undue influence ..." *Id.,* §§ 1567(1) and 1567(4).

#### A. *6th Cause of Action for Economic Duress*

3. "Under California law, economic duress can serve as a basis for invalidating a release or waiver." *U.S. for Use and Benefit of Reed v. Callahan,* 884 F.2d 1180, 1184 (9th Cir.1989) (applying California law); see also, *Kaufman and Broad–South Bay v. Unisys Corp.,* 822 F.Supp. 1468, 1475 (N.D.Cal.1993) (Whyte, J.).

4. Economic duress is an equitable doctrine which "come[s] into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Development, Inc.,* 157 Cal.App.3d 1154, 204 Cal.

---

**2.** Any conclusion of law which is more properly viewed as a finding of fact is hereby incorporated

into the factual findings.

Rptr. 86, 89 (1984); accord, *Philippine Export v. Chuidian*, 218 Cal.App.3d 1058, 267 Cal.Rptr. 457, 466 (1990) (quoting *Rich & Whillock*); see also, *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir.1987) (applying California law) ("Economic duress occurs when a person subject to a wrongful act, such as a threat to withhold payment of an acknowledged debt, must succumb to the demands of the wrongdoer or else suffer financial ruin.").

■ 5. The doctrine of economic duress serves as a "last resort" to correct exploitation of business exigencies "when conventional alternatives and remedies are unavailing". *Rich & Whillock, supra*, 204 Cal.Rptr. at 90.

■ 6. In order to establish his claim for economic duress, Johnson was required to prove by a preponderance of evidence the following elements: (i) IBM engaged in a sufficiently coercive wrongful act such that; (ii) a reasonably prudent person in Johnson's economic position would have had no reasonable alternative but to succumb to IBM's coercion; (iii) IBM knew of Johnson's economic vulnerability; and (iv) IBM's coercive wrongful act actually caused or induced Johnson to endorse the Release.

### i. *coercive wrongful act element*

■ 7. The "wrongful act need not be in the nature of a tort or crime". *Rich & Whillock, supra*, 204 Cal.Rptr. at 89. However, "[m]erely being put to a voluntary choice of perfectly legitimate alternatives is the antithesis of duress ... Encouragement is a far cry from coercion or denial of choice." *In re Executive Life Ins. Co.*, 32 Cal.App.4th 344, 38 Cal.Rptr.2d 453, 481 (1995).

■ 8. IBM did not commit a "wrongful act" by designating Johnson a surplus employee or by requiring that he choose between (a) accepting a lower-paying manufacturing job with IBM, (b) accepting two weeks severance, at IBM's discretion, or (c) accepting a twenty-six weeks enhanced severance package with additional health and job-placement benefits in consideration for signing the Release.

9. IBM's handbook, as periodically revised, did not provide Johnson with a con-

tractual right to permanent employment nor create any obligations on IBM's part. See, *Brossard v. IBM*, 1990 WL 54574 (D.Ore. April 24, 1990) (construing 1984 version of IBM's handbook under Oregon law).

10. The choices posed to Johnson under IBM's involuntary reduction-in-force program were presented pursuant to a valid change in IBM's severance policies. "While employers who choose to provide a severance plan assume certain fiduciary duties in *administering* it, they remain free to unilaterally *amend* or *eliminate* such plans without considering the employees' interests." *Joanou v. Coca–Cola Co.*, 26 F.3d 96, 98 (9th Cir.1994) (emphasis in original).

### ii. *reasonable alternatives element*

■ 11. "[A] reasonably prudent person subject to [a wrongful] act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin". *Rich & Whillock, supra*, 204 Cal.Rptr. at 89. In determining whether a reasonable alternative was available, courts employ an objective test dependent on the circumstances of each case. *Zeilinger v. SOHIO Alaska Petroleum Company*, 823 P.2d 653, 658 (Alaska 1992) (applying Alaska law).

■ 12. When he signed the Release, on January 27, 1995, Johnson was not facing imminent bankruptcy or financial ruin. Regardless of what he may subjectively have believed, Johnson had objectively reasonable alternatives to signing the Release. The employment market for computer programmers in Silicon Valley during this period was such that Johnson could have found substitute employment as a computer programmer in the two-month period between October 28 and December 31, 1993, during which he was still being paid by IBM. His skin condition and state of mind did not prevent him from seeking alternative employment during this period.

13. Alternatively, Johnson could have applied for transfer to a sedentary manufacturing job with IBM at a reduced income. Johnson was capable of performing a sedentary manufacturing job notwithstanding his skin condition and the income from such a

position, although substantially reduced, would have been sufficient to forestall "financial ruin".

14. Additionally, at least until he obtained another income source, Johnson could have relied on his available lines of credit and economized on his discretionary expenditures.

### iii. *knowledge of plight element*

■ 15. A defendant's "knowledge" of the plaintiff's economic exigencies is a necessary component of liability for economic duress. See, *San Diego Hospice v. County of San Diego,* 31 Cal.App.4th 1048, 37 Cal.Rptr.2d 501, 507 (1995).

16. IBM had no knowledge of Johnson's particular economic circumstances nor of any peculiar economic vulnerability he had.

### iv. *causation element*

■ 17. Finally, the defendant's wrongful, coercive act "must induce the assent of the coerced party". *In re Marriage of Baltins,* 212 Cal.App.3d 66, 260 Cal.Rptr. 403, 414 (1989); see also, *Rich & Whillock, supra,* 204 Cal.Rptr. at 89 ("cause ... to succumb").[3]

■ 18. Johnson's decision to endorse the Release, instead of availing himself of other reasonable alternatives, was his own, made knowingly and freely after receiving advice of counsel, and was not caused by any untoward action on the part of IBM.[4]

19. At the time he endorsed the Release, on January 27, 1994, Johnson was *not* subject to economic duress.

### B. *7th Cause of Action for Undue Influence*

■ 20. A release agreement may also be avoided on grounds of undue influence. *Philippine Export, supra,* 267 Cal.Rptr. at 466.

21. "Undue influence consists: [1] In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining unfair advantage over him; [2] In taking unfair advantage of another's weakness of mind; or [3] In taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal.Civ.Code § 1575.

22. "Undue influence ... is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment." *Odorizzi v. Bloomfield School Dist.,* 246 Cal.App.2d 123, 54 Cal.Rptr. 533, 539 (1966). "In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object." *Odorizzi, supra,* 54 Cal.Rptr. at 540. "In combination, the elements of *undue susceptibility* in the servient person and *excessive pressure* by the dominating person make the latter's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person." *Id.* (emphasis added).

■ 23. The elements of "excessive force" and "undue susceptibility" are symbiotic, because a greater quantity of one may compensate for a lesser quantity of the other. "Undue influence involves a type of mismatch which [Cal.Civ.Code § 1575] calls unfair advantage. Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force, the match is equally out of balance." *Odorizzi, supra,* 54 Cal.Rptr. at 541.

24. "While most reported cases of undue influence involve persons who bear a confidential relationship to one another, a confidential ... relationship between the parties

---

**3.** The causation element under Alaska law, relied upon as analogous authority by IBM, is stated somewhat differently. Instead of requiring a nexus between contractual *assent* and coercion, Alaska law requires that the economic *circumstances* permitting no reasonable alternative "were the result of coercive acts". *Zeilinger, supra,* 823 P.2d at 657. To the extent this represents a material difference between the two standards, the Court necessarily follows the California line of authority rather than the Alaska rule.

**4.** Johnson's financial circumstances were likewise not the result of IBM's actions. Thus, causation is lacking under the Alaska test also. See, *Zeilinger, supra,* 823 P.2d at 657.

need not be present when the undue influence involves unfair advantage taken of another's weakness or distress." *Odorizzi, supra*, 54 Cal.Rptr. at 539–40.

25. In order to establish his claim for undue influence, Johnson was required to prove by a preponderance of the evidence the following elements: (i) that IBM applied *excessive* pressure to induce Johnson to sign the Release; and (ii) that Johnson was *unduly* susceptible to such extraordinary persuasion. Johnson was required to prove that the level of IBM's pressure when combined with the level of his susceptibility created an imbalance sufficient that IBM obtained unfair advantage.

### i. *excessive pressure element*

26. Excessive pressure, or "overpersuasion", is "generally accompanied by certain characteristics which tend to create a pattern. The pattern usually involves several of the following elements:

"(1) discussion of the transaction at an unusual or inappropriate time,

"(2) consummation of the transaction in an unusual place,

"(3) insistent demand that the business be finished at once,

"(4) extreme emphasis on untoward consequences of delay,

"(5) the use of multiple persuaders by the dominant side against a single servient party,

"(6) absence of third-party advisers to the servient party, [and]

"(7) statements that there is no time to consult financial advisers or attorneys.

"If a number of these elements are simultaneously present, the persuasion may be characterized as excessive." *Odorizzi, supra*, 54 Cal.Rptr. at 541.

27. Not one of the seven indicia of overpersuasion listed in *Odorizzi, supra*, is present in this case. IBM did not employ excessive pressure or overpersuasion to induce Johnson to endorse the Release instead of resorting to other reasonably available options. Indeed, IBM exerted no pressure or persuasion whatsoever.

### ii. *undue susceptibility element*

28. "Undue susceptibility may consist of total weakness of mind which leaves a person entirely without understanding; or, a lesser weakness which destroys the capacity of a person to make a contract even though he is not totally incapacitated; or ... a still lesser weakness which provides sufficient grounds to rescind a contract for undue influence. Such lesser weakness need not be longlasting nor wholly incapacitating, but may be merely a lack of full vigor due to age, physical condition, emotional anguish or a combination of such factors.... In some of its aspects this lesser weakness could perhaps be called a weakness of spirit." *Odorizzi, supra*, 54 Cal.Rptr. at 540 (citations omitted).

29. At the time he signed the Release, on January 27, 1994, Johnson did not suffer from a total weakness of mind which left him "entirely without understanding", *see* Cal.Civ.Code § 38, nor was Johnson afflicted with a lesser weakness which destroyed his capacity to make a contract. *See id.,* § 39. Johnson, instead, had a mere weakness of spirit caused by his dismay at losing his job which he had held over the preceding twenty years and by his anger and frustration in believing that he had been racially discriminated against by his former employer. This lesser weakness, whatever its *medical* diagnosis, was *legally* insufficient for rescission of a contract for undue influence. Johnson's minimally heightened susceptibility to extraordinary persuasion was not accompanied by the actual exercise of overpersuasion and, as such, there was no "mismatch which our statute [Cal.Civ.Code § 1571] calls unfair advantage". *Odorizzi, supra*, 54 Cal.Rptr. at 541.

30. At the time he endorsed the Release, on January 27, 1994, Johnson was *not* subject to undue influence by IBM.

### C. *Enforceability of Release*

31. The Release is fully enforceable and therefore all of Johnson's claims are barred.

## IV. *Order*

Accordingly, the IT IS HEREBY ORDERED that defendant IBM is entitled to

judgment on plaintiff Johnson's Sixth and Seventh Claims and dismissal of all other claims in the Second Amended Complaint.

SO ORDERED.