[No. G038569. Fourth Dist., Div. Three. Apr. 22, 2008.]

JOSEPH MYERCHIN, Plaintiff and Appellant, v.
FAMILY BENEFITS, INC., Defendant and Respondent.

1528

## Counsel

DesJardins & Panitz and Eric A. Panitz for Plaintiff and Appellant.

Law Office of Rick Augustini and Rick Augustini for Defendant and Respondent.

## Opinion

**BEDSWORTH, Acting P. J.**—We hold in this case that a party offered a monetary settlement of a lawsuit may accept the money or reject it, but may not take the money *and* continue the lawsuit. That is what Joseph Myerchin attempted to do in this case and that is why a summary judgment was entered against him. Shorty after accepting and spending the money paid to him pursuant to the settlement, Myerchin refused to dismiss the complaint. Instead, he argued the settlement agreement was unenforceable, because Family Benefits' attorney had continued to negotiate it with him directly, even after becoming aware he had retained counsel. The trial court rejected the assertion the evidence of direct negotiation, even if true, rendered the agreement unenforceable, and granted summary judgment. We conclude the court was correct.

Despite Myerchin's assertions otherwise, the evidence is insufficient as a matter of law to demonstrate the settlement agreement was the product of duress, was unconscionable, or was rendered void or unenforceable as a matter of public policy. Additionally, we agree with the trial court's determination that Myerchin's failure to make any effort to actually rescind the agreement, specifically including any offer to refund the money he received

in consideration of the settlement, precludes his assertion that the agreement could not be relied upon to defeat his claim. The judgment is affirmed.

## FACTS

Myerchin, through his attorney, Michael DesJardins, filed his complaint for breach of contract on November 9, 2005. The complaint alleges Myerchin entered into an agreement with Family Benefits whereby it agreed to pay him $200,000 upon its receipt of certain payments owed to it by a debtor, and that Family Benefits breached the agreement.

On December 9, 2005, Myerchin signed a written settlement agreement releasing the claim alleged in his complaint, which is specifically identified by filing date and superior court case number. In exchange for that release, Family Benefits agreed to make two payments to Myerchin: one payment in the amount of $41,000 (based upon the estimated cost of a particular type of municipal bond, plus $10,000), and another payment in the net amount of $30,288 (reflecting a gross payment of $100,000, minus $69,720 in forgiveness of "loans" previously made to him).[1] Myerchin agreed to dismiss his lawsuit within 10 days of execution of the settlement agreement.

Although Family Benefits made the agreed-upon payments to Myerchin, he did not dismiss the complaint. So, on April 26, 2006, Family Benefits, Inc., answered the complaint and filed a cross-complaint seeking enforcement of the settlement. In his amended answer to the cross-complaint, Myerchin alleged, as the basis of five separate affirmative defenses, that the settlement agreement was "unenforceable" because Family Benefits's attorney, Dimitri Gross, had continued to negotiate the issue of settlement with him directly, despite being aware that Myerchin had retained counsel to file the original lawsuit on his behalf.

After completing some discovery relating to both the settlement agreement and Myerchin's underlying contract claim, Family Benefits moved for summary judgment in November of 2006. It asserted the settlement agreement constituted a complete defense to Myerchin's complaint. In support of its motion, Family Benefits pointed out that (1) it had fully performed its obligations under the agreement; (2) Myerchin had made no attempt to return the money he was paid in consideration of the settlement; and (3) Myerchin had admitted, in response to requests for admissions that (a) he no longer had any of the settlement money, and (b) he lacked to ability to repay the settlement money. Family Benefits argued that Myerchin had not effectively rescinded the settlement agreement, and he could not *both* retain its benefits and disregard its obligations while continuing to pursue the litigation.

---

[1] We are aware the numbers do not add up; apparently, the parties were not.

Myerchin opposed the motion, arguing that the settlement agreement was the product of "constructive fraud, undue influence, duress [and] unconscionability"; it was "against public policy"; and was thus subject to rescission. According to his own declaration, Myerchin had worked "closely" with Gross, who was then Family Benefits's attorney, from May of 2002 to May of 2004, to collect a judgment owed to Family Benefits. In consideration of his efforts, Myerchin was to receive $200,000. Throughout this period, Myerchin considered himself and Gross to be "on the same side," and he "grew to respect and trust [Gross]." The two were not only business associates, but also friends, and they "surfed together several times."

However, according to Myerchin, after Family Benefits collected on the judgment in July of 2005, it refused to pay him the agreed-upon sum. Then, "[t]hroughout September 2005 and October 2005, [Gross] attempted to negotiate a smaller payment on behalf of Family Benefits, Inc., and [Myerchin] refused to accept it." Finally, on October 31, 2005, Myerchin retained DesJardins to review a proposed settlement agreement and represent him in a lawsuit to enforce his claim. They had only one meeting before Myerchin informed Gross, in early November, that he had consulted an attorney about the proposed settlement, and Gross responded that the settlement offer currently on the table was not negotiable.

On November 23, 2005, Gross (who was then on vacation) telephoned Myerchin and said words to the effect of "Joe, this is Dimitri, what the fuck are you doing? I just got a call from Estelle Sheldon that you filed a lawsuit against Family Benefits, Inc., game on. We will bury you. Estelle has a war chest and she doesn't want to pay you. I am trying to help you and your attorney doesn't know what he is doing and is just ripping you off and will just run up a big bill. We will countersue you and you will end up owing us money. Your only chance to settle is to deal with me." Myerchin immediately told Gross he wanted to settle, and Gross responded "you are ruining my vacation; this is the best deal you will ever get. When I get back I will send you the settlement agreement."[2]

When Myerchin later received the updated proposed settlement agreement, he did not ask DesJardins to review it, because "[Gross] had convinced me that Mr. DesJardins would not act in my best interest. I felt helpless and defeated with nobody to turn to because I believed [Gross.]" Consequently, on December 9, 2005, more than two weeks after his conversation with Gross, Myerchin signed the settlement agreement and accepted the payment. He did not immediately inform DesJardins about the settlement because he was "afraid and ashamed," and finally informed him on March 24, 2006, only

---

[2] Family Benefits contends there are disputes of fact relating to this alleged conversation, but treats Myerchin's version as undisputed for purposes of summary judgment.

because Gross was pressuring him to dismiss the pending case. After discussing the matter with DesJardins, Myerchin became convinced he had been "taken advantage of" by Gross.

Myerchin also acknowledged he had admitted, in response to requests for admission, that he lacked the ability to refund the settlement payment, but attempted to limit the significance of that concession. He declared that although "on the day I executed the Response to Defendant's Requests for admissions I did not have the funds that I received in exchange for signing the settlement agreement, I have and have always had both the ability and willingness to return the $71,288.00 to Family Benefits, Inc., to effect the rescission of the settlement agreement."

In his opposition to the motion Myerchin acknowledged he had neither given notice of rescission, nor offered to restore the money received in settlement, when he discovered his grounds for rescission in March of 2006. However, he asserted his amended answer to the cross-complaint, filed several months later, qualified as a "pleading . . . that seeks relief based on rescission" and thus was entitled to be "deemed such notice or offer or both" under Civil Code section 1691. He asserted that he was "prepared to return [the money] received under the settlement agreement *as soon as a determination of rescission is established*" and argued there was "no evidence to show that [Family Benefits] has been substantially prejudiced by the delay in receiving back these funds." (Italics added.)

The court granted the summary judgment. In its ruling, the court explained: "Plaintiff has admitted that he signed the settlement contract . . . ; that it includes a release of these claims . . . ; that it was not ambiguous . . . ; and that he was represented by counsel at the time he signed it . . . . Plaintiff's contentions that he was not given an opportunity to have his counsel review the contract and that he was so influenced by defendant's attorney that he couldn't bring himself to have his attorney review it are not supported by the evidence. Plaintiff also admits . . . that he has never paid back any of the monetary benefits he received pursuant to the settlement agreement and cites no authority for the proposition that he may rescind without either paying back all of the money or offering to pay all of it back."

## DISCUSSION

### I

"While '[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact' (*Brose* v. *Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079,

1081 [228 Cal.Rptr. 620]), it is also true '[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one.' (*Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744].)" (*M.B.* v. *City of San Diego* (1991) 233 Cal.App.3d 699, 704 [284 Cal.Rptr. 555].)

In this case, the "merits" of the original lawsuit may forever be in dispute, but what is not in dispute is that (1) Family Benefits paid a substantial sum to buy its peace; and (2) Myerchin would like to both keep the money and maintain the war. Like the trial court, we conclude he cannot.

Civil Code section 1691 provides that a party wishing to rescind a contract must "promptly upon discovering the facts which entitle him to rescind," do two things to effect that rescission: "[g]ive notice of rescission to the party as to whom he rescinds; and [¶] . . . [r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so."

Although Myerchin did *neither* of these things, he points out the statute goes on to state that "[w]hen notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." (Civ. Code, § 1691.) Myerchin argues that his amended answer to Family Benefits's cross-complaint qualifies as such a pleading. We cannot agree, for two reasons.

■ First, as reflected in Civil Code section 1692, a pleading that seeks relief based on rescission means something specific: it is "an action to recover any money or thing owing to him by any other party to the contract *as a consequence of such rescission* or for any other relief to which he may be entitled under the circumstances or . . . *asserting such rescission by way of defense or cross-complaint.*" (Italics added.) In other words, a pleading seeking relief based upon rescission is one that alleges facts demonstrating a rescission *has been effected*—not merely facts that, if proved correct, would establish a legal basis to elect a rescission at some point in the future.

In this case, Myerchin's amended answer does not even mention, let alone assert, a rescission. Instead, it merely alleges facts which he contends render the settlement agreement "unenforceable." It makes no mention of the settlement payment already received, let alone include any offer to restore those funds. Even now, Myerchin is not actually making that offer; instead, he is merely stating a willingness to do so after trial, when "a determination

of rescission is established." Consequently, the amended answer, on its face, does not constitute an assertion of rescission.

The second problem with Myerchin's reliance on the pleading provision of Civil Code section 1691 is that Myerchin himself admitted, in response to requests for admissions served in the wake of his amended answer, that he *had never offered* to restore the settlement payments, no longer had any of the settlement money, and was unable to repay it. Such admissions are "conclusively established against the party making the admission in the pending action . . . ." (Code Civ. Proc., § 2033.410, subd. (a).) Consequently, in light of those admissions, we could not pretend that the earlier amended answer was intended to be "deemed" a notice of rescission, or an offer to restore benefits, as contemplated by Civil Code section 1691.

Myerchin next argues that, even assuming he had never offered to restore the money he received in settlement, he would still have a claim for rescission, because Civil Code section 1693 provides that such an offer can be made at any time prior to judgment, or even made a condition of judgment, absent substantial prejudice to the other party.[3]

Based on Civil Code section 1693, Myerchin claims the proper course of this litigation would be for him to retain the settlement funds pending the court's adjudication of whether he is entitled to a rescission based upon the facts alleged in his amended answer—an adjudication the court would presumably make in conjunction with its adjudication of his original breach of contract claim. And if the court concludes he is entitled to rescind, it could order that the restoration of the settlement payments is "a condition of its judgment granting rescission."

Although Myerchin suggests this scenario would not be prejudicial to Family Benefits—which would, after all, get its settlement money back in the event he elected to comply with the "conditional" rescission judgment—we wholly disagree. Indeed we can hardly imagine a scenario more prejudicial to Family Benefits than the one proposed by Myerchin.

As Family Benefits points out, Myerchin is suggesting he should be allowed to keep the settlement money, while continuing to litigate the very claim he

---

[3] Civil Code section 1693 provides in pertinent part: "A party who has received benefits by reason of a contract that is subject to rescission and who in an action or proceeding seeks relief based upon rescission shall not be denied relief because of a delay in restoring or in tendering restoration of such benefits before judgment unless such delay has been substantially prejudicial to the other party; but the court may make a tender of restoration a condition of its judgment." As we have already explained, however, Myerchin's amended answer did not "seek relief based upon rescission."

was paid to dismiss. At the end of the litigation, he would either (1) keep the settlement money, because the court determined he was not entitled to rescind the settlement, or (2) have the *option* of enforcing a "conditional" rescission judgment by *returning* the settlement funds—a decision he would presumably make depending upon whether he recovers a *greater amount* on his original contract claim. By contrast, Family Benefits would, in either case lose *the sole benefit* it had contracted for in the settlement—avoidance of the uncertainty and expense of this litigation.

■ Consequently, what renders Myerchin's delay in effecting a rescission of the settlement agreement in this case prejudicial to Family Benefits is not merely the delay in restoring *the money* Family Benefits *gave up* in the settlement, but also the delay in allowing Family Benefits to enjoy the benefit of that bargain—i.e., *freedom from this litigation.* Every day that Myerchin delayed in his rescission—while simultaneously refusing to dismiss his original complaint—is a day that Family Benefits was denied the benefit of its bargain.[4] As explained some time ago in *Sime v. Malouf* (1949) 95 Cal.App.2d 82 [212 P.2d 946] (*Sime*), when a plaintiff seeks to rescind a *settlement agreement*, he must effectuate that rescission *before* he is free to pursue the released claim. "[P]laintiff must restore what he has received in settlement of the disputed claim before suing upon it. He cannot retain the benefits of the release and sue, for to sue would violate the terms of his bargain. *To hold otherwise would frustrate the very purpose of the release and destroy its effectiveness as a favored device for eliminating litigation.* Hence rescission is necessary; and may be effectively accomplished only by returning *the entire consideration received*, for if plaintiff should fail to establish his cause of action, he would not be entitled to retain anything." (*Id.* at p. 111, italics

---

[4] Myerchin's assertion that Family Benefits was not prejudiced by his delay in effecting rescission focuses entirely on the impact of his failure to promptly return the settlement money. He argues that failure could not have been prejudicial because (1) Family Benefits has a lot of money; and (2) the settlement payment represents only a portion of the $200,000 that Family Benefits actually owes him under the terms of the contract he originally sued on. But even assuming that specific delay in restoring the settlement payment were the only possible "prejudice" stemming from Myerchin's failure to promptly rescind, Myerchin's arguments are unpersuasive. First, although Family Benefits may have so much money that the loss of $73,000 would make no difference to it (and we cannot believe that would be true of anyone), that would not mean Myerchin's undeserved *gain* of $73,000 would not be prejudicial to it. Litigation favors the well-heeled, and no litigant would gratuitously agree to transfer money to its opponent while the dispute remains unresolved. Hence, Myerchin's ability to treat Family Benefits's money as his own during the pendency of the very litigation that money was intended to settle necessarily increases the resources he can use to shoulder the burdens of that litigation—and consequently prejudices the interests of Family Benefits. As to Myerchin's second point, the merits of his original contract claim were disputed, and his self-serving contention that he was entitled to be paid the full $200,000 he sought from Family Benefits in his original complaint is just that—a contention. It does not constitute substantial evidence that Family Benefits would actually be required to pay him $200,000 if the settlement agreement were rescinded.

added, citing *Taylor v. Hopper* (1929) 207 Cal. 102 [276 P. 990], *Garcia v. California Truck Co.* (1920) 183 Cal. 767 [192 P. 708], and *Westerfeld v. New York Life Ins. Co.* (1900) 129 Cal. 68 [61 P. 667].)

■ As reflected in *Sime*, a settlement agreement is presumptively valid, and the plaintiff remains bound by the bargain he made until he actually rescinds it. Thus, pending such a rescission, a defendant remains free to assert the settlement in defense of the plaintiff's claim, as Family Benefits did here. Myerchin's attempt to simply preserve rescission *as an option* to be adjudicated by the court at some later date, while simultaneously pursuing the merits of the claim he had agreed to dismiss, was improper as a matter of law.[5]

Myerchin's final contention is that he was excused from any obligation to restore the settlement payment if the attempt to do so would have been "futile." He argues triable issues of fact exist with respect to this issue. However, Myerchin failed to make that argument in the trial court, and it is consequently waived. (*Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113 [30 Cal.Rptr.2d 486]; *In re Marriage of Modnick* (1983) 33 Cal.3d 897, 913, fn. 15 [191 Cal.Rptr. 629, 663 P.2d 187].)

And even if it were not waived, the "futility" claim is an insufficient basis to defeat summary judgment in this case. According to Myerchin's own

---

[5] The cases cited by Myerchin in support of his contention that restoration of benefits is not required are inapposite. For example, in *Hil-Mac Corp. v. Mendo Wood Products, Inc.* (1965) 235 Cal.App.2d 526 [45 Cal.Rptr. 396], the plaintiff had been paid for services performed under a contract prior to its notice of rescission. The court concluded the plaintiff was not required to offer restoration of the money paid for those prior services in order to rescind, because the services had value independent of the contract, and the plaintiff would be entitled to compensation for them without regard to whether the contract remained in effect. *Oliver v. Campbell* (1954) 43 Cal.2d 298, 306 [273 P.2d 15], is to the same effect: "On the issue of the necessity of restoration or offer to restore the part payment for the services which Campbell had made, the rule applies that *such restoration is not necessary where plaintiff would be entitled to it in any event.*" (Italics added.) And finally, in *Sime v. Malouf, supra,* 95 Cal.App.2d 82, the plaintiff was seeking to rescind an agreement by which he had sold his interest in a joint venture, and there was an allegation that the agreement also constituted a release of the very fraud claim he was pursuing in the case. The court explained, however, that, in the circumstances of that case, restoration of the amount paid in consideration of the agreement was not required, because it was *undisputed* that he would be entitled to a greater amount if the agreement were rescinded and his interest in the venture were restored. As the court explained, "restoration is not necessary, in order to avoid the bar of a release, *where there is no question as to the right of the plaintiff, arising independently of the release itself, to retain what he received.*" (*Id.* at p. 111, italics added.) In this case, by contrast to those cited above, the only consideration given by Myerchin in the settlement agreement was his release of claims—consideration which has no "value" independent of the agreement itself. He had no right, independent of that agreement, to retain that payment. He was consequently required to restore the payment as a condition of claiming rescission.

argument, "futile" means that "the defendant is unable or refuses to rescind, or it is certain that the offer of restoration will be refused." Here, it is beyond dispute that Family Benefits was *able* to rescind, because doing so required nothing other than its agreement. And, it is undisputed that Myerchin never actually gave notice of rescission (preferring instead to simply dangle the possibility that he might elect to do so), and thus he cannot possibly establish that Family Benefits *refused to rescind.* Finally, absent some prompt demand for rescission, it is impossible to be "certain" that an offer of restoration would have been refused. Indeed, in the circumstances of this case, where Myerchin made no affirmative effort at all to effect a rescission, his contention that it would have been "futile" to tender restoration of the settlement money is entirely speculative. And speculation alone does not constitute substantial evidence which can defeat summary judgment.

■ Based upon all of the foregoing, the trial court correctly determined that Myerchin's failure to effect a rescission of the settlement agreement, including specifically his failure to notify Family Benefits that he was rescinding and to tender restoration of the payments he received thereunder—precluded his attempt to avoid application of that agreement to the claims he had asserted in his complaint. Absent *an actual*, rather than merely *a contemplated*, rescission, the settlement agreement remained in effect. Consequently, Family Benefits was entitled to rely upon that agreement as a basis for summary judgment—without regard to whether Myerchin might have been able to prove sufficient *grounds* for rescission.

## II

Even if Myerchin had actually made an attempt to rescind the settlement agreement, we agree with the trial court's determination the evidence he submitted in opposition to the summary judgment was insufficient, as a matter of law, to constitute grounds for relief based thereon.

Although Myerchin relies upon several legal theories in support of his claimed right to rescind, each of those theories is grounded on a single claim of wrongful conduct; i.e., that Gross, Family Benefits's then attorney, continued negotiating the settlement agreement with him directly, even after becoming aware Myerchin had retained counsel. In doing so, Gross assertedly violated California Rules of Professional Conduct, rule 2-100 (Rule 2-100), which provides in pertinent part: "While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer." As explained in *Jackson v. Ingersoll-Rand Co.* (1996) 42 Cal.App.4th 1163, 1167 [50 Cal.Rptr.2d 66], the rule is intended "to preserve the attorney-client relationship from an opposing attorney's intrusion and interference."

Based solely on the theory that Gross's conduct violated Rule 2-100, Myerchin asserts that enforcement of the resulting settlement agreement would "violate public policy." However, in making that argument, Myerchin ignores the fact the policy favoring preservation of the attorney-client relationship from another attorney's intrusion is not *the only public policy* implicated in this case. Of course, there are also strong policies favoring the settlement of disputes (*Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 871–873 [239 Cal.Rptr. 626, 741 P.2d 124]; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1475 [69 Cal.Rptr.3d 273]; *Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1357 [60 Cal.Rptr.3d 693]) and the enforcement of contracts freely entered into.

 As this court explained in *Mills Land & Water Co. v. Golden West Refining Co.* (1986) 186 Cal.App.3d 116 [230 Cal.Rptr. 461], the trial court must balance such "competing interests" when an attorney violates the rule against communicating with a represented party during the pendency of litigation, and exercise its discretion in determining how to best address the improper consequences of the misconduct. (*Id.* at p. 127.) The court's goal is not to impose a *penalty*, as the propriety of punishment for violation of the Rules of Professional Conduct is a matter within the purview of the State Bar, not of a court presiding over the affected case. (See Bus. & Prof. Code, § 6077; *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 658–659 [109 Cal.Rptr. 269].) Instead, what the court must do is focus on identifying an appropriate remedy for whatever *improper effect* the attorney's misconduct may have had in the case before it.

In this case, despite Myerchin's conclusory assertions, there was simply no *evidence* that Gross's direct communication with him in late November of 2005, following his retention of counsel, would have rendered him unable to make a reasoned decision about settlement. As Family Benefits points out, Myerchin had been negotiating the settlement directly with Gross, whom he considered a friend, for *two months* prior to that time. During that earlier period, Myerchin had been able to withstand Gross's efforts to persuade him to accept a lesser amount than what he believed he deserved. Absent some intervening event which caused the sudden loss of Myerchin's free will (and he points to none),[6] we must presume he remained able to do so—and that

---

[6] Indeed, the only circumstance which Myerchin contends actually changed between the earlier period, during which he had been able to withstand Gross's imprecations, and the telephone conversation in late November, was Myerchin's retention of counsel. But nothing about that decision would support the inference Myerchin had suddenly became more vulnerable in his dealings with Gross, or less capable of making a decision. In this regard, we reject the assertion made by Myerchin's counsel at oral argument that clients are like "children" in that they require the "protection" of their attorneys just as children require the protection of their parents. The analogy is unsound. The law presumes that children are incompetent to protect their own interests in negotiating contracts, and thus requires they be

his ultimate decision to enter into a settlement agreement was *a voluntary one.*[7]

Because there was no evidence that Gross's direct communication with Myerchin in November of 2005, even assuming it violated Rule 2-100, actually impaired his ability to make a reasoned decision about settlement, we conclude the trial court properly rejected the assertion that the mere *fact* of that improper communication would be sufficient to nullify the agreement.

■ Similarly, there was no evidence suggesting Myerchin's consent to the settlement was induced by economic duress, undue influence, or actual or constructive fraud. Economic duress can be a basis for rescission of a settlement agreement, but only in circumstances where the perpetrator commits "a *wrongful act* which is sufficiently *coercive* to cause a reasonably prudent person *faced with no reasonable alternative* to succumb to the perpetrator's pressure." (*Rich & Whillock, Inc. v. Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158 [204 Cal.Rptr. 86], italics added.) Examples of such "wrongful acts" include "[t]he assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment . . . ." (*Id.* at p. 1159.) In this case, Myerchin offered no evidence Family Benefits had acted either coercively or in bad faith when it refused to pay his disputed contract demand, and offered no evidence he lacked any *reasonable alternative* to settlement. His alternative was to pursue litigation and, according to his own assertions, he had already commenced his pursuit of that alternative at the time he allegedly succumbed to settlement "pressure." But the mere fact Myerchin felt he needed to be paid on his disputed claim as soon as possible, and chose to take less in the settlement than he might have ultimately recovered in litigation, does not create a triable issue of "economic duress."

given a greater degree of protection. "The law shields minors from their lack of judgment and experience and confers upon them the right to avoid their contracts in order that they may be protected against their own improvidence and the designs and machinations of other people . . . ." (*Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 137 [225 P.2d 238].) Adults, by contrast, are presumed to be competent to enter into agreements—and a competent adult's decision to hire a lawyer does not make that adult suddenly less competent as an individual. In the absence of some evidence that the adult's competence to enter into an agreement has *otherwise* been compromised, we would not presume that had occurred simply because an attorney had been retained.

[7] Moreover, as Family Benefits points out, it is undisputed that Myerchin continued to negotiate even after he had agreed to settle. When Myerchin first appeared at Gross's office to sign the final settlement agreement, he was offered payment in some form other than a cashier's check. He insisted upon a cashier's check, and returned to complete the settlement only when one had been obtained. This just does not sound like the conduct of someone overwhelmed by an intimidating opponent.

■ Myerchin's claim Gross exercised undue influence over him was likewise unsupported by substantial evidence. "Undue influence involves a type of mismatch which our statute calls unfair advantage. (Civ. Code, § 1575.) Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force, the match is equally out of balance. If will has been overcome against judgment, consent may be rescinded. [¶] . . . [¶] However, overpersuasion is generally accompanied by certain characteristics which tend to create a pattern. The pattern usually involves several of the following elements: (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys. If a number of these elements are simultaneously present, the persuasion may be characterized as excessive." (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 132–133 [54 Cal.Rptr. 533].)

In this case, Myerchin offered no evidence to establish such a "pattern." The only element of "overpersuasion" which even bears upon the issues raised in Myerchin's opposition to summary judgment is "absence of third-party advisers to the servient party." However, there was no evidence Myerchin was precluded from seeking out such advice, and he certainly had ample opportunity to consult either the attorney he had already retained, or whomever else he wished, during the two-week period between the time he orally committed to settlement, and the time he actually executed the written agreement. That he *chose* not to do so, apparently because he was "embarrassed," does not suggest he was a victim of overpersuasion.

Myerchin's assertion of actual or constructive fraud is likewise unsupported. These claims fail as a matter of law because there is no evidence suggesting Myerchin could have reasonably believed that Gross was "on his side" or was looking out for his best interests during the telephone conversation in late November of 2005. Although Myerchin may have previously considered Gross to be his friend, and may have "trusted" him in the context of that relationship, it is undisputed that Myerchin at all times understood that Gross was representing Family Benefits, and not him, in connection with the $200,000 payment dispute. And if the status of Gross's loyalties was not clear to Myerchin prior to the November telephone conversation, Gross's statements during the conversation certainly would have made it so. Gross's response to the possibility that Myerchin would pursue litigation was to announce "game on," followed by a promise that he and Family Benefits would "bury" Myerchin.

Such hostile statements leave no room for acceptance of Myerchin's asserted belief that Gross was actually trying to "help him," when he exhorted Myerchin to settle and made disparaging remarks about the motivations of Myerchin's attorney—whom Gross did not even know. And of course, the fact that Gross did not know Myerchin's attorney makes it unreasonable, as a matter of law, for Myerchin to have relied on Gross's assessment of that attorney's competence or ethics (i.e., "your attorney doesn't know what he is doing and is just ripping you off and will just run up a big bill)." (See *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255] [justifiable reliance is a necessary element of a fraud claim].)

And finally, there is no support for Myerchin's claim the settlement agreement was "unconscionable." As Myerchin concedes, both procedural and substantive unconscionability must be present before a contract will be deemed unenforceable on that basis. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 [99 Cal.Rptr.2d 745, 6 P.3d 669].) Procedural unconscionability focuses on " ' "oppression" ' or ' "surprise" ' due to unequal bargaining power," while substantive unconscionability focuses on " ' "overly harsh" ' or ' "one-sided" ' results." (*Ibid.*, quoting *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486–487 [186 Cal.Rptr. 114].) As we have already explained, there is no evidence Myerchin was either oppressed or surprised during the negotiation of the settlement agreement. And we could not conclude there was "unequal bargaining power" simply because Gross is an attorney while Myerchin is not.

Even if there had been some evidence of procedural unconscionability, there would still be no basis to conclude the settlement agreement was substantively unconscionable. The agreement provided Myerchin was to receive the equivalent of approximately $140,000 (comprised of cash payments and loan forgiveness) in consideration for his release of a disputed $200,000 liability. There is simply nothing "overly harsh or one-sided" about that bargain.[8]

---

[8] We acknowledge Myerchin's assertion that the $69,000 amount identified as loan forgiveness in the settlement agreement must be disregarded in evaluating its fairness. According to Myerchin, he never incurred liability for such loans, and thus cannot be considered to have benefited from a settlement provision "forgiving" them. But even it that were true, and the total consideration for Myerchin's settlement were the $73,000 in cash which he does admit receiving, that would not affect our determination that the settlement was not unduly one sided.

The judgment is affirmed. Family Benefits is to recover its costs on appeal.

O'Leary, J., and Moore, J., concurred.

On May 20, 2008, and May 29, 2008, the opinion was modified to read as printed above.