Filed 2/29/16  Amar Plaza, Inc. v. Rampart Properties CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| AMAR PLAZA, INC., | B254564 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC431030) |
| v. | |
| RAMPART PROPERTIES, INC., et al., | |
| Defendants and Appellants. | |

 

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael L. Stern, Judge.  Appeal dismissed.

Law Offices of Martin N. Buchanan and Martin N. Buchanan for Defendants and Appellants.

BASTA, Ross T. Kutash, Matthew L. Brinton; and Daniel J. Bramzon for Plaintiff and Respondent.

_____

Rampart Properties, Inc. (Rampart) and its owner, Frank Acevedo, appeal from a judgment in favor of Amar Plaza, Inc. (Amar Plaza) for damages and declaratory relief. Amar Plaza filed a motion in this court to dismiss the appeal claiming that "the parties entered into a full and final settlement agreement resolving all of the claims at issue in this appeal." Rampart and Acevedo opposed the motion on the ground that the parties never reached a final settlement agreement and, if they did, it was never approved by the bankruptcy court in Acevedo's bankruptcy case. We remanded the cause to the superior court to make findings regarding the alleged agreement. After an evidentiary hearing, the trial court determined that the appeal should proceed because Amar Plaza's counsel negotiated the settlement with Acevedo's bankruptcy counsel without involving Rampart and Acevedo's appellate counsel—conduct the court determined violated rule 2-100 of the California State Bar Rules of Professional Conduct (rule 2-100).[1] We have reviewed the court's findings, the record, and the parties' supplemental briefs. We disagree with the court's application of rule 2-100 and conclude that the parties had reached a settlement disposing of this appeal. Accordingly, we grant the motion to dismiss.

I.    *Background*

Amar Plaza is a nonprofit mutual benefit corporation that owns a 15-building, 96-unit apartment complex in La Puente. The residents of the apartment complex are the owners, or "members," of Amar Plaza. Amar Plaza is subsidized and regulated by the United States Department of Housing and Urban Development (HUD). HUD regulations require that HUD approve of the property manager and any encumbrances against Amar Plaza's property.

In September 2004, Amar Plaza and Rampart entered into a "Management Agreement." Under the agreement, Rampart, as Amar Plaza's agent, was authorized to lease apartments, collect rents and other receipts, evict members, contract for operational services, and arrange for property maintenance and repairs. Rampart was entitled to a

---

[1]    Although Judge Michael Stern presided over the trial in this case, Judge Ernest Hiroshige presided over the evidentiary hearing on remand.

management fee equal to 8 percent of the gross receipts, plus other specified fees and reimbursements. HUD approved of the agreement and certified Rampart as the property manager.

In June 2005, Amar Plaza and Rampart entered into a "Consulting Agreement" under which Rampart would provide, in addition to management services, "corporate and management consulting services" and "maintenance and repair services" through its "Building Services" affiliate.

Amar Plaza maintained a cash account for general operations and, in addition, two reserve funds that HUD required: An "operating reserve" fund to meet occasional operating deficiencies; and a "reserve for replacement" fund to pay for the replacement of structural elements and mechanical equipment. Withdrawals from the reserve for replacement fund required HUD's prior approval.

Around the time Rampart took over as the property manager, Amar Plaza had a cash account balance of $199,466, an operating reserve balance of $95,958, and a reserve for replacement balance of $352,493. Three years later, Amar Plaza's operating cash balance had fallen to zero, the operating reserve account was reduced to $15,558, and the reserve for replacement account balance had fallen to $210,878.

HUD uses a real estate assessment, or "REAC score" to evaluate the physical condition of a property. In 2004, Amar Plaza's complex achieved a "very good" REAC score of 89 out of a possible 100 points. Three years later, in 2007, HUD gave the property a "failing" REAC score of 56 and designated the property as "high-risk or troubled."

In February 2008, HUD informed the Amar Plaza board of directors that Rampart was "no longer satisfactory to HUD and [had to] be replaced." HUD cited the failing REAC score, negative management reviews, unspecified "financial statement flags and/or violations," and "numerous complaints and/or dissatisfactions from current and former residents." Rampart was eventually terminated as the property manager in December 2008.

Rampart's tenure as the property manager was also marked by conflict among members over control of the board of directors. By early 2009, there were, according to one HUD official, "two dueling groups that were claiming to be the board of directors and trying to exert control at the property." The conflict was resolved in July 2009 by an election, arranged by HUD, to recall certain members of the board of directors and replace them with others. Two of the recalled board members are defendants Amparro Sierra and Samuel Lizzarraga.

On June 19, 2009, about two weeks before the recall election, Sierra and Lizzarraga signed a promissory note purporting to obligate Amar Plaza to pay $100,000 to Rampart. The note was dated February 1, 2009. At trial, Sierra, Lizzarraga, and Acevedo explained that the obligation was based upon payments and transfers that Rampart made to or on behalf of Amar Plaza between December 2008 and March 2009. According to its terms, principal and interest were due on July 1, 2009. It also included an attorneys' fees provision. The note was secured by a deed of trust against the property signed by Sierra and Lizarraga on behalf of Amar Plaza. The deed of trust was recorded on June 29, 2009. HUD never approved the encumbrance.

At trial, Kelly Boyer, a former HUD field office director, testified that HUD personnel became concerned that a $100,000 advance to Amar Plaza from its reserve for replacement fund had not been used as authorized for roof replacement. Boyer sent an architect to Amar Plaza to "make a determination as to whether or not [the roofs] had been replaced." The architect reported back to Boyer that "the roofs had not been replaced."

In November 2009, Rampart recorded a notice of default on the $100,000 note, and commenced nonjudicial foreclosure procedures under the deed of trust.

In February 2010, Amar Plaza filed a verified complaint against Rampart, Acevedo, Sierra, Lizarraga, and a third former board member, Cuahtemoc Lopez. Against Rampart and Acevedo, Amar Plaza alleged causes of action for fraud, "Misappropriation of Membership Funds" and "Unjust Enrichment," and unfair business

4

practices. The complaint included a cause of action for breach of fiduciary duty against Sierra, Lizarraga, and Lopez. Although neither Rampart nor Acevedo were named in that cause of action, the court, over Rampart and Acevedo's objection, allowed the jury to consider that count against Rampart and Acevedo as well. In addition to damages, Amar Plaza sought an injunction to stop Rampart's foreclosure, a judicial declaration that the deed of trust is void or voidable, and restitution under the unfair competition law.

Rampart filed a cross-complaint for foreclosure and a deficiency under the promissory note and deed of trust, damages for breach of contract based on the unpaid promissory note, and a common count for money had and received.

In a special verdict, the jury found Rampart liable for fraud, breach of fiduciary duty, and misappropriation. It further found that Rampart did not "loan money to Amar Plaza." The jury awarded Amar Plaza $295,714.62 in consequential damages against Rampart and Acevedo and $75,000 in punitive damages against Acevedo. Based on the jury's finding that Rampart did not loan money to Amar Plaza, the trial court granted Amar Plaza declaratory relief voiding the note and deed of trust. It thereafter awarded Amar Plaza $541,416.71 in costs and attorneys' fees.

Rampart and Acevedo filed a timely notice of appeal.

II.     *Amar Plaza's Motion to Dismiss The Appeal*

In July 2014, Amar Plaza moved to dismiss Rampart and Acevedo's appeal on the ground that "the parties entered into a full and final settlement agreement resolving all of the claims at issue in this appeal." Rampart and Acevedo opposed the motion. We remanded the cause to the trial court to determine "whether the parties entered into a valid settlement agreement and, if so, whether that agreement included an implied waiver of the appeal." A different judge held an evidentiary hearing on the matter and concluded that Rampart and Acevedo had not waived their right to appeal.[2] Now, after considering

---

[2]     Our order of remand stated that the cause was "remanded to Judge Michael Stern of the Los Angeles County Superior Court" to determine the specified issues. Judge Stern had presided over the trial in the case. Unbeknownst to us, after the notice of

5

the trial court's findings, the parties' supplemental briefs, and the record, we grant the motion.

A.  *Factual Background*

Following entry of the judgment in December 2013, Amar Plaza began collection efforts against Rampart and Acevedo. At that time, the amount of the judgment, including interest, was approximately $1 million. The collection activities against Acevedo stopped when he filed a bankruptcy petition in April 2014. Attorney Glenn Calsada represented Acevedo in the bankruptcy case; he did not represent Acevedo or Rampart in the appeal. Attorney Martin Buchanan represented Rampart and Acevedo in the appeal.

During a meeting of creditors in Acevedo's bankruptcy case, Amar Plaza's attorney, Paul Katrinak, invited Calsada to submit a settlement proposal. Calsada testified that he and Acevedo "made clear he was not giving up his appeal right." Katrinak admitted that Calsada told him that Acevedo wanted to retain his right to appeal as part of any settlement, but testified that he told Calsada, "unequivocally no way. We would never agree to any type of resolution that would involve Mr. Acevedo preserving his right to appeal."

On June 13, 2014, Calsada emailed to Katrinak a proposal to "avoid further litigation costs" and "to settle all claims" in exchange for Acevedo's payment of $180,000. It contained no mention of the appeal. Each side exchanged further proposals, none of which mentioned the appeal, culminating in an email on June 22, 2014, from Katrinak to Calsada with the following terms: The settlement amount was $850,000;

appeal was filed and prior to our order of remand, the superior court reassigned the case to Judge Ernest Hiroshige for reasons unrelated to the appeal. Judge Hiroshige held the evidentiary hearing and issued the pertinent findings and rulings.

Amar Plaza contends that it was error to have anyone other than Judge Stern decide the questions we posed. We disagree. Our order referred to Judge Stern because our records indicated that he was the judge assigned to the case. Because the case had been reassigned to Judge Hiroshige, however, it was appropriate to have the matter heard by him. There was no error.

6

a $50,000 "good faith" payment would be due in July; a second payment of $400,000 would be due in September (or earlier upon the sale of certain property); and the final $400,000 would be paid "over three years in monthly payments." There would be "a stay on additional fees and interest, all of which shall be re-instated upon any default." The settlement amount would be discounted by 15 percent if paid within two years and 20 percent if paid within one year.

On June 23, 2014, Calsada informed Katrinak that the June 22 proposal "is accepted," and suggested that they dismiss Acevedo's bankruptcy case when they appear at a hearing previously scheduled for June 25. Doing so, Calsada explained, would avoid the need to set another hearing to obtain bankruptcy court approval of the agreement. Katrinak responded the same day, stating: "That's fine. It makes sense to dismiss the [b]ankruptcy."

On the morning of June 25, 2014, Calsada, for Acevedo, and Ross Kutash, for Amar Plaza, appeared in the bankruptcy court. Based on their stipulation, the court granted the United States Trustee's motion to dismiss the case.

That afternoon, Calsada sent an email to Katrinak attaching a copy of the June 22 email signed by Acevedo. Acevedo's signature is dated June 24, 2014, and appears on a line above two statements: "Frank Acevedo, an individual"; and "Frank Acevedo, President Rampart Properties, Inc." In his email, Calsada stated: "As you know, the [bankruptcy] case was dismissed today, an order will be signed and entered later. In any event, Frank [Acevedo] has now signed off on Amar Plaza's counter-proposal accepting your terms and conditions. . . . Can you counter-sign and return by fax or email?" At some point thereafter, Maria Ochoa, as President of Amar Plaza, signed the June 22 email (without dating her signature).

On June 27, 2014, the bankruptcy court filed its written order dismissing Acevedo's bankruptcy case.

On July 2, 2014, Katrinak telephoned Buchanan (Rampart and Acevedo's appellate counsel) and informed him that the case had settled. According to Buchanan,

7

this was the first time he had heard of a settlement or of any settlement negotiations. Five days later, Buchanan emailed Katrinak "to clarify an apparent misunderstanding between the parties." Buchanan explained that Acevedo's "sole intent was to agree to make payments on the judgment to prevent further collections by Amar Plaza, while preserving his right to appeal the judgment. He has never agreed to dismiss his appeal from the judgment, either on behalf of himself or Rampart." Buchanan further stated that Acevedo "is still willing to make payments on the existing judgment" on terms that included those set forth in the June 22 email with the following additional provisions: "Any payments made pursuant to this Agreement will be returned if the judgment is reversed, and any excess payments will be returned if the judgment is reduced"; and "[t]his Agreement shall not deprive Acevedo and/or Rampart of the right to appeal the judgment." Katrinak rejected the proposal.

After the evidentiary hearing, the trial court issued a minute order stating: "The Court finds that as to the purported settlement agreement in this matter, there was no implied waiver of the appeal in this matter. The appeal should continue." (Boldface omitted.) The court based its ruling primarily on the conclusion that Katrinak, by failing to involve Buchanan in the settlement discussions, violated rule 2-100. As a result of this violation, the court explained it could not make "any adverse implication regarding [Rampart's and Acevedo's] appellate rights." In light of this conclusion, the court did "not believe it [was] necessary to make a finding that the purported settlement was a valid agreement and indeed resulted in an implied waiver of the appeal in this matter." The court also, however, expressly adopted "the points and authorities and arguments" found in the defendants' closing brief. Defendants' closing brief argued, inter alia, that the parties had not entered into a binding settlement agreement because they had not reached a meeting of the minds on material terms, including the resolution of the pending appeal.

8

After the trial court transmitted its ruling to this court, the parties filed supplemental briefs, which we have considered.[3]

B.      *The Settlement Agreement is Enforceable and Includes an Implied Dismissal of this Appeal*

Initially, we reject the trial court's reliance on a perceived violation of rule 2-100 as a basis for its ruling.  Even if Katrinak's failure to involve Buchanan in the settlement negotiations violated the rule—a question we need not decide—the violation does not affect the validity of the agreement.  *Myerchin v. Family Benefits, Inc.* (2008) 162 Cal.App.4th 1526 (*Myerchin*), is instructive.  In that case, Dimitri Gross, an attorney for the defendant, had been negotiating the settlement of a dispute with the plaintiff, Myerchin, at a time when Myerchin was not represented by counsel.  Myerchin eventually retained counsel to review a settlement proposal.  His attorney then filed a lawsuit on Myerchin's behalf against the defendant.  (*Id.* at p. 1531.)  When Gross learned that Myerchin retained counsel and filed the lawsuit, he called Myerchin and told him, "I am trying to help you and your attorney doesn't know what he is doing and is just ripping you off and will just run up a big bill.  We will countersue you and you will end up owing us money.  Your only chance to settle is to deal with me." (*Ibid.*)  Soon afterward, Myerchin settled with the defendant without telling his attorney.  Myerchin subsequently argued that the settlement agreement was unenforceable based on Gross's violation of rule 2-100.  (*Id.* at p. 1538.)  The *Myerchin* court rejected this argument, stating:  "[W]hen an attorney violates the rule against communicating with a represented party during the pendency of litigation, . . . the court must . . . focus on identifying an appropriate remedy for whatever *improper effect* the attorney's misconduct may have had in the case before it." (*Ibid.*)  "Because there was no evidence that Gross's

---

[3]      In addition to supplemental briefs, Rampart and Acevedo filed a request for judicial notice of various documents filed in the trial court pertaining to the remand, a copy of the reporter's transcript of the evidentiary hearing, and the claims register for Acevedo's bankruptcy court proceeding.  Amar Plaza did not oppose the request and we grant it. (Evid. Code, §§ 452, subds. (d) & (h), 453, 459.)

direct communication with Myerchin . . . , even assuming it violated rule 2-100, actually impaired [Myerchin's] ability to make a reasoned decision about settlement, we conclude the trial court properly rejected the assertion that the mere *fact* of that improper communication would be sufficient to nullify the agreement." (*Id.* at p. 1539.)

Here, Acevedo was represented by counsel during the settlement negotiations. Although that counsel was not his counsel on this appeal, nothing in the record suggests that Acevedo's representation by his bankruptcy counsel, rather than his appellate counsel, "impaired [his] ability to make a reasoned decision about settlement." (*Myerchin*, *supra*, 162 Cal.App.4th at p. 1540.) Therefore, even if we assume that Katrinak violated rule 2-100, Acevedo and Rampart cannot thereby avoid the consequences of settlement.

Settlement agreements are governed by the legal principles applicable to contracts generally. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810 (*Weddington Productions*).) An essential element of contract formation is mutual consent communicated by each party to the other. (Civ. Code, §§ 1550, 1565.) The existence of mutual consent is determined by an objective test: Whether the words used and the "'outward manifestations of consent would lead a reasonable person to believe'" that the parties agreed upon the same thing in the same sense. (*Weddington Productions*, *supra*, 60 Cal.App.4th 793, 811.) "Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." (*Meyer v. Benko* (1976) 55 Cal.App.3d 937, 943.) "'Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms . . . .' [Citation.]" (*Ibid.*) Terms that "are necessary to make a contract reasonable, or conformable to usage, are implied" when "the contract manifests no contrary intention." (Civ. Code, § 1655; see generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 751, p. 842 [a reasonable term essential to a determination of the parties' rights and duties can be supplied by the court].)

We agree with Amar Plaza that the parties entered into a binding settlement agreement under the terms set forth in the June 22 email. After receiving the email, Calsada informed Katrinak that the proposal "is accepted," and that he had informed the United States Bankruptcy Trustee of the settlement. Acevedo then signed the document for himself and Rampart following the words "ACCEPTED AND AGREED." Finally, the president of Amar Plaza signed the document. When, as here, it appears that the parties "'intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.'" (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 817, quoting 1 Corbin on Contracts (1963) § 95, p. 400.)

A "gap" left in the June 22 email is the status of the appeal. According to Calsada and Acevedo, the proposal's silence regarding the appeal meant that the appeal was unaffected by the agreement. Amar Plaza, on the other hand, points to the failure to mention the appeal as evidence that Rampart and Acevedo did not preserve their right to appeal. We agree with Amar Plaza.

A settlement agreement, by its nature, implies a settlement of, at least, known and pending claims between the parties. Indeed, a settlement reached during the pendency of an appeal "effectively extinguishes the judgment from which the appeal is taken, thus, ending the prior dispute between the parties." (*Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1180.) If Rampart and Acevedo desired the unusual circumstance of a settlement that somehow preserved the claims between the parties, it was incumbent upon them to express that intention and include it in the terms of the agreement. Although Calsada initially informed Katrinak that Acevedo wanted to retain his right to appeal, he introduced his first settlement proposal by stating that Acevedo would like to settle "to avoid further litigation costs." He then proposed "to settle all claims" in exchange for a stated sum. The phrase "litigation costs" in this context reasonably includes the costs of pursuing the appeal, and "all claims," unless differently

11

defined, includes claims on appeal. This language is not only consistent with the general understanding that a *settlement* agreement will *settle* pending claims, it indicates that Acevedo had dropped his initial insistence that he retain the right to appeal as part of any settlement. In subsequent proposals, the parties focused on the amount and terms of the payment to be made, and Calsada made no mention of preserving the right to appeal.

Under these circumstances, the actions of the parties would have been reasonably understood by the other as expressions of intent to settle all claims between them in exchange for the payments specified in the agreement. Because such claims include this appeal, we construe the agreement as requiring Acevedo and Rampart to dismiss the appeal.

Acevedo contends that the settlement agreement is "without legal effect" because it was never approved by the bankruptcy court. We reject this argument. The record reveals that Calsada "accepted" the terms set forth in Katrinak's June 22 email on June 23. At that time, a hearing was scheduled to take place in Acevedo's bankruptcy case on June 25. In order to avoid the need to set an additional hearing to obtain bankruptcy court approval for the settlement, Calsada suggested to Katrinak that "we dismiss" the bankruptcy case at the June 25 hearing. Katrinak agreed. On the morning of June 25, 2014, Calsada (for Acevedo) and Ross Kutash (for Amar Plaza) appeared before the bankruptcy court and announced their stipulation to dismiss Acevedo's case. Based on the stipulation, the court ordered the case dismissed. That afternoon, Calsada sent an email to Katrinak attaching a copy of the June 22 email that included Acevedo's signature, and stated: "As you know, the [bankruptcy] case was dismissed today, an order will be signed and entered later. In any event, Frank [Acevedo] has now signed off on Amar Plaza's counter-proposal accepting your terms and conditions. . . . Can you counter-sign and return by fax or email?" Maria Ochoa subsequently signed the agreement on behalf of Amar Plaza. On June 27, 2014, the court filed its written order dismissing the bankruptcy case.

Even if Calsada's June 23 acceptance of the terms in the June 22 email could not have been enforced at that time because of Acevedo's pending bankruptcy, the exchange of executed copies of the email after the court dismissed the bankruptcy case formed a contract that did not require bankruptcy court approval. Although Acevedo points out that the bankruptcy court's written order dismissing the case was not filed until June 27—two days after Calsada sent Acevedo's signed copy to Katrinak—the order dismissing the bankruptcy case was effective against Acevedo when it was made in court on June 25; Calsada was present when the court ordered the case dismissed and, later that day, expressly represented to Katrinak that the "case was dismissed." (See *Noli v. C.I.R.* (9th Cir. 1988) 860 F.2d 1521, 1525 [bankruptcy court's oral order was binding on petitioner who was present in court when order was made and understood and accepted the order as final].) Moreover, even if the agreement was made prior to the order dismissing the bankruptcy case, the dismissal had the effect of validating the earlier agreement. (See *Valencia v. Rodriguez* (2001) 87 Cal.App.4th 1222, 1227-1228 [dismissal of bankruptcy petition validated settlement agreement made during pendency of bankruptcy case].) We therefore reject Acevedo's argument that the absence of bankruptcy court approval makes the agreement unenforceable.

For the foregoing reasons, we grant Amar Plaza's motion to dismiss the appeal.

If we did not grant the motion to dismiss, we would still affirm the judgment. Contrary to Rampart and Acevedo's arguments, there was sufficient evidence to support the judgment. Boyer's testimony regarding the $100,000 advance for roofs that were never replaced supports an inference that Rampart misappropriated such funds. Although Rampart and Acevedo argue that Boyer's testimony was based on hearsay, they neither objected to the testimony nor presented any contrary evidence. The jury could also reasonably infer that Rampart misappropriated other funds based on Rampart's withdrawal from Amar Plaza's accounts of approximately $243,000 for maintenance and repairs at the same time that the physical condition of the property deteriorated

13

substantially.  We also reject Rampart and Acevedo's claims that procedural and instructional errors require reversal of the judgment.

## DISPOSITION

The appeal is dismissed.  Respondent shall recover its costs on appeal.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:


JOHNSON, J.


LUI, J.